1828.

Fish
v.
Howland.

---

### FISH v. HOWLAND AND OTHERS.

Where it is sought to charge lands with a legacy, it seems that the legatee is a necessary party.

Although one legatee may file a bill in favor of himself and all others who might choose to come in under the decree, yet the bill must state the fact that it is filed in behalf of the complainant and all others, &c.

Where a trustee prosecutes a claim for the benefit of the *cestui que* trust, the latter must be made a party.

A grantor of lands has an equitable lien on the estate sold for the payment of the purchase-money; and this lien is not waived by the grantor's taking the mere personal security of the purchaser only, unless there is an express agreement between the parties that the equitable lien be waived. But wherever any security is taken on the land sold, or otherwise, for the whole or a part of the purchase-money, the equitable lien will be waived, unless there is an express agreement that it shall be retained.

So the lien is waived where a note or bond is taken of the vendee for the purchase-money, in which a third person joins as security.

Likewise, if the vendee sells to a third person, without notice, the lien is lost.

ON the 10th day of February, 1813, Samuel Howland, then about 86 years of age, conveyed his farm to the defendant, Daniel Howland, his grandson, with whom he <span style="float:right">May 13th.</span>

expected to reside the remainder of his life; and took back a life lease, at a nominal rent. He also took from Daniel a bond of the *same date, which, after reciting that the farm was leased to Samuel Howland, during his natural life, with the intent, however, that Daniel should occupy it so long as he should maintain, sustain and decently support his grandfather, during his natural life, was conditioned to pay to Jonathan Howland $340, as a legacy from Samuel Howland, within one year from the death of the said Samuel. The mother of Daniel Howland, together with her children, continued to reside on the farm, Daniel and Pontus taking charge of the same, and their grandfather resided with them until November, 1819; when Daniel, having become intemperate and troublesome, the old gentleman left them and went to reside with his son in law, the complainant, who supported him till his death, in 1825. In 1816, Daniel conveyed to Pontus, his brother, one half of the farm, on the same terms and conditions as those on which he received it, and took from him a bond, as to one half of the legacy, &c., similar to that which had before been given to the grandfather, by himself. On the 16th of November, 1819, while Daniel was confined by a broken leg, the complainant, as he alleges, by direction of Samuel Howland, went to the house on the farm, where the Howlands, with their mother, resided, and procured from Daniel an assignment of the bond of Pontus Howland; and also obtained from him the original deed from Samuel Howland, with a release thereon, in the words and figures following: "Know all men by these presents, that I, Daniel Howland, of the town of Washington, have remised, released and forever discharged, and by these presents, do, for me, my heirs, executors and administrators, remise, release and forever discharge Samuel Howland, of the same town, his heirs, executors and administrators, of and for all and all manner of actions, suits, debts, dues, sums of money, accounts, recognizances, bonds, bills, specialties, covenants, contracts, controversies, agreements,

claims and demands whatever, in law and equity, which against the said Samuel Howland I ever had, now have, or which I, my heirs, executors or administrators hereafter can, shall or may have, for, upon or by reason of any matter, cause or thing whatsoever, *from the beginning of the world to this day of the date of these presents. Dated November the 16th, in the year 1819.

DANIEL HOWLAND, [L. S.]

Witness present, Peter Fish, Fanny Howland.

The complainant alleges that the above release was executed in pursuance of an agreement with Daniel to reconvey the farm, and was intended as a reconveyance. The defendants deny that any such agreement was made, or that Daniel ever intended to reconvey the farm; but they allege, that at the time of the date of the release, Daniel was deranged, in consequence of the pain arising from his broken limb, and that they are informed and believe, that during such derangement, the complainant fraudulently procured the possession of the deed, and procured from Daniel his signature to the release, and to the assignment of the bond of Pontus Howland. Fanny Howland, the mother is dead; and Peter Fish, the other subscribing witness to the assignment and release, is the complainant in this cause. On the 22d of November, 1819, Samuel Howland made his will, and charged his debts upon his real estate; gave a legacy of $340 to Jonathan Howland, charged upon his real estate, and payable in one year after the testator's death, and devised the residue of his estate to his grandsons, the defendants Pontus and Samuel Howland, and appointed the complainant his executor, with power to sell and divide his estate agreeably to the will. The testator had no personal estate, and claimed no real estate, except the farm before mentioned, and died indebted to the complainant in a large sum for board, &c. On the 16th of April, 1825, after the death of Samuel Howland, the defendant Haight purchased of Pontus Howland the one fourth of

the farm which had been conveyed to him by Daniel Howland in 1816, for $930; and before the conveyance was executed, or any part of the purchase-money paid, Haight had notice from the complainant of the claims upon the premises set up in the bill in this cause. In May, 1825, Daniel Howland conveyed his one fourth of the farm to the defendant, Solomon Howland, his brother, who is an infant, for the sum of $5. The complainant seeks to charge both of these shares with the payment of the debt of Samuel *Howland, for maintenance, &c., and with the legacy to Jonathan Howland, on the ground that they are an equitable lien on the estate as originally conveyed to Daniel Howland; and he also insists, that the alleged agreement of the 16th of November, 1819, should be carried into effect, by decreeing the release of that date a valid reconveyance of so much of the premises as then belonged to Daniel Howland. The case was submitted on the pleadings and proofs, and on written arguments.

*Fish*, for complainant.

*Swift*, for defendants.

THE CHANCELLOR:—So far as the bill seeks to charge the lands conveyed to Daniel Howland, or any of the defendants personally, with the legacy of $340 to Jonathan Howland, and charged by the testator on his real estate, it would seem that the legatee was a necessary party. In *Morse* v. *Sadler*, (1 Cox's Cases, 352,) the Master of the Rolls decided, that every legatee, whose legacy was charged upon the real estate, must be a party to the bill. It is true, that case was overruled by Chancellor Kent, in *Brown* v. *Rickets*, (3 Johns. Ch. Rep. 553,) where it was held, that one legatee might file a bill in favor of himself and all others who might choose to come in under the decree. But even there, Chancellor Kent considers it necessary that the bill should state the fact that it is filed in behalf of the complainant and all

others, &c. The reason of the rule seems to be, that the defendants may not be charged with a double defence. The creditor or legatee sues for his own debt or legacy, and claims nothing in behalf of others standing in the same situation, unless they choose to come in and make their claim; in which case they will be bound by the decree. They have a right to come in and make their claim in the first suit; and if they neglect to do it, the court will not subject the defendants to the expense of re-litigating the whole subject again in another action. In this case, the complainant has no interest whatever in this legacy, or any other. It is, therefore, the ordinary case of a trustee prosecuting a claim for the benefit *of the *cestui que trust*, in which the latter should be a party. (*Kirk* v. *Clark, et al.*, Prec. Ch. 275; 2 Eq. Ca. Abr. 165, S. C.) For aught that appears in this case, Jonathan Howland may not wish to charge the defendants, or the estate, with the payment of the legacy of $340.

The release of the 16th of November, 1819, indorsed on the deed, can by no possible construction, operate as a reconveyance of the farm, or any part thereof, to Samuel Howland. And although I am not satisfied from the testimony, that Daniel was actually deranged at that time, so as to render his acts void on that account, it is very probable he was so far intoxicated, that he does not recollect what did take place. There is not, however, that certain and satisfactory evidence of what agreement, if any, was made on that occasion, which would warrant this court in decreeing a specific performance, or in correcting the terms of the papers then executed.

The right of the vendor to an equitable lien on the estate sold, for the payment of the purchase-money, has frequently been drawn in question both in England and in the courts of this country. In England, and I believe in every state of the Union which has a court of chancery to give effect to such a lien, it is admitted to exist. But what is to be construed a waiver or abandonment of the implicated lien, is a

[*24]

question which is not well settled; and the cases on this point are not easily reconciled with each other. It may therefore be necessary for me to examine this question somewhat at length.

The earliest case which I have been able to find, in relation to this implied lien, is *Chapman* v. *Tanner*, before Lord Guilford, in 1684, (I Vern. Rep. 267.) By the report of that case, in Vernon, it appears the vendee had become bankrupt, and the question was, whether the vendor had a preference to be paid the purchase-money out of the proceeds of the lands, or must come in as a general creditor under the statute. And the lord keeper decided that there was a natural equity that the land should stand charged with the unpaid purchase-money, without any special agreement for that purpose. But, by a reference to the register's book, it appears [\*25] *there was a special agreement in that case, that the seller should retain the title deeds until the purchase-money was paid. (Ambler's Rep. 726 ; 1 Bro. Ch. Rep. 424, note b.) The next case, *Bond* v. *Kent*, (2 Vern. 281,) was decided a few years afterwards, while the great seal was in commission, after Chancellor Jeffries was killed by the populace. In that case the vendor took back a mortgage on the land for part of the purchase-money, and took the vendee's note for the residue. And it was decided that there was no lien upon the land, as to that part of the purchase-money not included in the mortgage. Then followed the case of *Coppin* v. *Coppin*, (2 Peere Wms. 291,) where Lord King decided in favor of the vendor's lien, notwithstanding a receipt for the purchase-money was indorsed on the conveyance of the estate. In *Pollexfen* v. *Moore*, (3 Atk. 272,) Lord Hardwicke charged the estate, in the hands of an heir at law, with the unpaid purchase-money due to the vendor. But in that case, too, as appears by the note of Mr. Sanders, the vendor retained the conveyances of the estate as security for the payment. Then followed the dictum of Sir Thomas Clark, Master of the Rolls, in *Burgess* v. *Wheat*, (1 Eden's Rep. 211,) where he expressly recog-

nizes the general principle of the vendor's equitable lien. The next case was *Tardiff and wife* v. *Scrughan*, which was never reported, but which is cited and referred to by Sir James Mansfield and Lord Rosslyn, in *Blackburn* v. *Gregson*, (1 Bro. Ch. Rep. 423.) In that case, the vendor conveyed the estate to his two daughters, in consideration of an annuity of 20*l.*, and took their joint bond to secure the payment of the same. One of the sisters married and died, and her husband, being entitled to a life estate in a moiety ·of the premises, refused to pay any part of the annuity. On a bill filed by the other sister and her husband, Lord Camden decided that a moiety of the annuity was a lien upon the estate, in the hands of the defendant; and directed that he should pay a moiety of the arrears, and keep down a moiety of the growing payments of the annuity. In *Farwell* v. *Heelis*, (Amb. Rep. 734,) Lord Bathurst declared, that taking the bond of the vendee for the purchase-money, payable at a future day,' was a discharge of the equitable lien. *This is the last English case prior to the revolution, but has been frequently overruled since; and it cannot be reconciled with the case of *Tardiff* v. *Scrughan*, which immediately preceded it. In *Blackburn* v. *Gregson*, (1 Bro. Ch. Rep. 420,) the vendor took the bond of the purchaser, payable by instalments, and afterwards became a bankrupt. On a bill filed by the assignees of the vendor, it was attempted to charge the land, in the hands of the assignees of the vendee, who was also a bankrupt, with the unpaid purchase-money, on the ground of equitable lien. This question was argued at great length before the lords commissioners; and Lord Rosslyn expressed a very decided opinion in favor of the lien; but the cause finally stood over on this point. It was afterwards re-argued, on the same point, before Lord Thurlow, (see 1 Cox. Ch. Rep. 90.) who avoided a decision of this question. The cause was finally disposed of on other points; and the question of lien was never decided. With the exception of the dicta in *Walker* v. *Preswick* and *Harrison* v. *Southcote*, (2 Ves. sen.

[*26]

393 and 622,) there is no other reported case on the subject, until the case of *Austin* v. *Halsey*, (6 Ves. jun. 475.) There a legatee claimed to be substituted in the place of the vendor, in regard to the equitable lien; and Lord Eldon says, "I consider it clearly settled, that the vendor has a lien for the purchase-money, while the estate is in the hands of the vendee. I except the case where, upon the contract, evidently that lien, by implication, was not intended to be reserved."[1]  A few months afterward, the case of *Nairn* v. *Rouse*, (6 Ves. 752,) came before Sir William Grant, Master of the Rolls, who declined entering into the general question whether every security taken for the purchase-

[1] *Stafford* v. *Van Rensselaer*, 9 Cow. 316; *Bradley* v. *Bosley*, 1 Barb. Ch. 125; *Warner* v. *Van Alstyne*, 3 Paige, 513; *Bailey* v. *Greenleaf*, 7 Wheat, 46; *Watson* v. *Wells*, 5 Conn. 468; *Jackman* v. *Hallock*, 1 Hammond, 318; *Tierman* v. *Beam*, 2 id. 383; *Patterson* v. *Johnson*, 7 id. 226; *Evans* v. *Goodlit*, 1 Blackford, 246.

In Connecticut, the doctrine of an equitable lien for the purchase-money has been somewhat modified. See *Meigs* v. *Dimock*, 6 Conn. 458. Church, J., in *Atwood* v. *Vincent*, 580, *et seq.*  In Pennsylvania, it does not exist after the vendor has conveyed the legal title, as against a subsequent judgment creditor: *Kauffelt* v. *Bower*, 7 Sergt. & R. 64; *Semple* v. *Burd*, id. 286; *Megargel* v. *Saul*, 3 Whart. 19: and has been exploded in North Carolina. *Womble* v. *Battle*, 4 Ired. Eq. Ca. 182.  The Supreme Court of the United States held, that it cannot be asserted against creditors, holding under a *bona fide* conveyance from the vendee, nor a subsequent *bona fide* purchaser without notice: *Bailey* v. *Greenleaf*, 6 Wheat, 46; 5 Cond. 229.  This decision is condemned in *Swelves* v. *Williams*, 3 Whart. 493; and in New York dissented from, unless the conveyance or mortgage to the creditor be founded on some new consideration, without notice of the lien.  See *Shirley* v. *Sugar Refinery*, 2 Edwards, 505.  But if the vendor takes security from a third person, he loses his lien. *Vail* v. *Foster*, 4 Comst. 312; either in whole or in part; *Shirley* v. *Sugar Refinery*, *supra.*  But the mere taking of a promissory note from the vendee, subsequent to the conveyance, will not act as a waiver; and it rests on the purchaser to prove that it was intended to operate as such.  Id. Chancellor Kent favors the decision of the Supreme Court in *Bailey* v. *Greenleaf*, 7 Wheat. 46; see 4 Kent, 154, n. f.

This doctrine in regard to vendors' liens seems to be derived from the Roman law, which passed the property unconditionally to the purchaser, if the seller took another pledge, or other security: *Venditæ vero res et traditæ non aliter emptori acquiruntur, quam si is venditori pretium solverit, vel alio modo ci satisfecerit, veluti ex promisore aut pignore dato.  Just.* 2, 1, 41.

money, necessarily amounted to a waiver of the lien of the vendor. He declared it to be then settled, that equity gives the vendor a lien for the purchase-money, without any special agreement to that effect. But if the vendor does not trust to that, and carves out a security for himself, he says it remains a matter of doubt, whether that does or does not amount to a waiver of the equitable lien. In *Elliott* v. *Edwards,* which came before the Court of Common Pleas the same year, (3 Bos. & Pul. 181,) a third person had become security for the *purchase-money on the sale of a leasehold estate, but the assignment of the lease contained an express covenant that the purchaser should not under-let, assign, or -transfer the premises without leave of the vendor, until the purchase-money was paid. The court decided this was an equitable incumbrance on the estate, which might be enforced against a purchaser with notice. In the case of *Hughes* v. *Kearney,* (1 Scho. & Lef. Rep. 132,) which came before Lord Redesdale in the following year, the vendee gave his note for the unpaid purchase-money, which was put into the hands of a third person, as trustee, until the incumbrances on the estate could be ascertained, and paid off out of the same, and then the residue to be paid to the vendor. It was held, that the balance of the purchase-money, included in the note, was a lien upon the lands, in the hands of the heir of the purchaser.

In *Mackreth* v. *Symmons,* (15 Ves. 329,) a bond had been given for the payment of the purchase-money, in the manner therein stated; and it was held, that the equitable lien on the land existed as against a purchaser with notice. Lord Eldon there refers to most of the previous decisions and dicta in relation to the general principle, which he considers well settled. But he renders the question, as to what shall be deemed a discharge of the lien, if possible, still more obscure. He even intimates, in opposition to the opinion of Sir William Grant, in *Nairn* v. *Rouse,* and taking a mortgage upon another estate, as security for the purchase money, might not be considered a waiver of the

1828.

Fish
v.
Howland.

[*27]

1828.

Fish
v.
Howland.

equitable lien on the premises sold. And in *Grant* v. *Mills*, (2 Ves. & Bea. 306,) the Master of the Rolls decided, that where the vendee drew bills on himself and his partner, obtained an acceptance thereof payable at a future day, and delivered them to the vendor for the purchase-money, the equitable lien was not discharged. He considered the bills only as a mode of payment, and not a security. I certainly should have come to a different conclusion, from the facts as stated in the report of that case. And the reasoning of the Master of the Rolls, upon the nature of the bills of exchange, would have been more appropriately applied to the case of a simple draft given in payment, where the additional security of the previous acceptance of a third person had not been required or agreed upon.

[*28]

*In *Ex parte Peake*, (1 Mad. R. 346,) Sir Thomas Plumer decided, that the vendor's receiving bills of exchange in payment of the purchase-money, did not discharge his lien upon the land. And in *Ex parte Loaring*, (2 Rose's Ca. in Bank. 79,) where the vendor had taken a negotiable note from the purchaser at four months, and had it discounted, but which was returned to him on the vendee's becoming a bankrupt, it was held, that the equitable lien on the estate was not waived; Lord Eldon at the same time expressing his wish that this species of lien had never been admitted, where the vendor had accepted a different security. In the case of *Saunders* v. *Leslie*, (2 Ball & Beatty, 514,) before Lord Manners, in Ireland, about the same time, it was decided, that the acceptance by the vendor of the bond or note of the purchaser, payable at a future day, was no waiver of the lien. And a still more recent case is referred to in a note of Simmons & Stuart, where it was admitted, that the giving of the bond of the vendee did not discharge the lien, although, from the nature of the covenants in the bond given in that case, and the special circumstances then stated, it was decided the lien was gone. (*Ex parte Parks*, 1 Glynn & Jameson's Rep. 228.) And in *Winter* v. *Lord Anson*, (1 Simons & Stuart's Rep. 434,) which is the last

English case to be found in any reports which have yet reached this country, Sir John Leach appears to be again travelling back to the decision of Earl Bathurst, in *Farwell* v. *Heelis*, which has been so often overruled. In this recent case before the Vice-Chancellor, the vendee gave his bond for the purchase-money, payable at the death of the vendor, and the interest thereof to be paid annually. A receipt for the purchase-money was indorsed upon the conveyance. It had been referred to a master to inquire if it was agreed between the parties that the bond should be accepted in payment, and that the vendor should have no lien upon the land. The master reported that it was not so agreed. But notwithstanding this, the Vice-Chancellor decided it was evident that the intention of the vendor was to part with the estate immediately, and to wait for the purchase-money till a future day, and consequently, that there was no lien for it on the land.

*It appears, from this review of the English cases, that the question, as to what shall be considered a waiver of the implied lien on the lands conveyed, for the unpaid purchase-money, is still unsettled in that country. But I am gratified to find, that in the American cases, so far as I have been able to discover, with one exception, there is a uniform current of authority in favor of what I consider, at this day, as the only correct rule on this subject; a rule which will enable vendors and purchasers to understand their respective rights, without the necessity of resorting to a court of chancery, to give a construction to the varying circumstances of each particular case.

The American case which I consider an exception to the uniform current of decision in this country, is *The Representatives of Wragg* v. *The Comptroller General*, in the chancery court of South Carolina, (2 Dessaus. Rep. 509,) and is founded upon the decision of Earl Bathurst, in *Farwell* v. *Heelis*, that the acceptance of the bond of the purchaser, payable at a future day, is a discharge of the equitable lien upon the land conveyed.

1828.

Fish
v.
Howland.

[*29]

The general rule as to the vendor's lien on the land, is recognized in the courts of Kentucky. But in *Francis* v. *Halerigg's ex'r.*, (Harden's Rep. 48,) where the vendor gave an absolute conveyance and took a bond for the purchase-money, in which a third person joined as security, the court decided there was no lien upon the land. In another case, (*Cox* v. *Fenwick*, 3 Bibb's Rep. 183,) Judge Owsly acknowledges the general rule, but adds, " The rule, however, is liable to various exceptions, as where the vendor takes a distinct and independent security for the purchase-money, or where, from other circumstances, it is clearly inferable that the vendor does not rely upon the lien on the land."

The same principle has been recognized in the court of appeals in Virginia. In *Cole* v. *Scott*, (2 Wash. Rep. 141,) it was decided, that no security having been taken for the purchase-money, the vendor had a lien upon the land. But Pendleton, president, observes, " If he hath taken a security, or the vendee hath sold to a third person, without notice, the lien is lost." And in a subsequent case, where the vendor* had conveyed the land and taken a bond for the purchase-money, in which a third person joined as security, it was decided the lien was lost. (*Wilson* v. *Graham's ex'r.*, 2 Munf. Rep. 297.)

[*30]

In *Gilman* v. *Brown*, (1 Mason's Rep. 214,) Judge Story held, that taking the notes of the vendee for the purchase-money, indorsed by a third person as his security, was a waiver of the lien; and his decision in that case was afterwards affirmed in the Supreme Court of the United States. (4 Wheat. 290.) In the case of *Gurson* v. *Green*, in this court, (1 John. Ch. R. 308,) Chancellor Kent recognizes the general doctrine of equitable liens for the purchase-money, and decides that taking the vendee's note does not discharge the lien. But he does not attempt to lay down any general rule as to what will and what will not operate as a discharge.

Lord Eldon seems to think that the question of lien or no lien depends altogether upon the intention of the parties,

and that each case must be determined upon that principle, and upon its own particular circumstances. If the actual intention of the parties was to govern the decision of the court, the lien would seldom be sustained; for it is probable that not one person in a hundred, who conveys or purchases real estate, is aware of the existence of such a principle of equity. A much safer rule, I apprehend, is, to sustain the implied lien whenever the vendor has taken the mere personal security of the purchaser only, and to consider any bond, note or covenant given by the vendee alone, as intended only to countervail the receipt of the purchase-money contained in the deed, or to show the time and manner in which the payment is to be made, unless there is an express agreement between the parties to waive the equitable lien; and on the other hand, to consider the lien as waived, whenever any security is taken on the land, or otherwise, for the whole or any part of the purchase-money, unless there is an express agreement that the equitable lien on the land shall be retained. This constitutes a safe rule, easily understood, and which I consider established by a weight of authority in this country which is not easily shaken. And I believe no English case, previous to the revolution, will be found in opposition to these *principles, except the case of *Farwell* v. *Heelis*, which is overruled by Chancellor Kent, in *Green* v. *Garson*.

Applying this rule to the case now under consideration, the lien which is claimed in this case, upon the land conveyed by Samuel Howland, cannot be sustained. The deed to Daniel Howland purports to be made in consideration of natural love and affection, and divers other good considerations. The object of the grantor was to dispose of his property after his death, and secure a legacy to his son; and, in the meantime, to retain the control of the property, so far as to secure to himself a maintenance out of the rents and profits thereof during his life. He did not rely on any implied lien upon the farm for this purpose, but carved out his own security for his support, by a direct incumbrance

[*31]

upon the estate conveyed. For this purpose, he took back a life lease of the premises at a nominal rent; and the use of the farm, probably, was then considered an ample provision for his support. The recital in the bond shows that this life lease was the only security for the support of the vendor which was contemplated between the parties. Even the bond itself contained no covenant that Daniel should support the old gentleman. The condition merely recited the understanding of the parties, that Daniel was to have the use of the farm free of rent, so long as he did actually maintain and support his grand-father; and whenever he neglected to provide such support, the vendor had a perfect right to resume the possession of the farm, or to exact rent for the use and occupation thereof. This case, therefore, comes within the principle adopted in *Bond* v. *Kent*, (2 Vernon, 284,) *expressum facit cessare tacitum ;* that where, by the agreement of the parties, there is an express lien upon the estate, for a part of the consideration of the conveyance, it excludes the idea of an implied lien for the residue. The same principle is also recognized by Chief Justice Marshall, in the case of *Brown* v. *Gilman*, already referred to.

The bill, as against the defendants, Solomon Howland and Robert Haight, must therefore be dismissed with costs. The complainant, as executor of his father-in-law, has a valid claim against the other defendants, for the use and occupation *of the premises after Daniel ceased to support the old gentleman, until the termination of the life lease; and that claim being now fairly before this court, I shall retain the bill against them for the purpose of an account and satisfaction of the rents and profits of the premises during that time.

The declarations of Samuel Howland, as to the abuse and bad conduct of Daniel, are certainly not legal evidence on which to found a claim in behalf of his personal representative. But the habitual intemperance of Daniel, and the consequences which must necessarily follow therefrom,

[*32]

together with other circumstances in the case, which are established independent of the declarations of the old gentleman, rendered it improper for Daniel Howland to have the care and support of his grand-father, at his advanced age. Daniel having, by his misconduct, forfeited all claim to retain the possession of the farm for the support of his grand-father, had no right to retain it, by transferring him to Pontus or any other person to be supported. The old gentleman had a perfect right to provide for his own support wherever he thought proper, which right he has exercised; and Daniel and Pontus were bound to deliver up to him the possession of the farm during the continuance of the life estate therein; but having neglected to do so, they are accountable to his personal representative for the rents and profits thereof. And there must be a reference to a master, to take such account from the 16th of November, 1819, to the death of Samuel Howland. And the question of costs, as between the complainant and Daniel and Pontus Howland, and all further directions, are reserved.