# WAECHTER v. WILDE, STATE EXAMINER

(No. 1866; December 11, 1934; 38 Pac. (2d) 321)

The cause was submitted for the defendant and appellant on the brief of *Ray E. Lee,* Attorney General; *O. O. Natwick,* Deputy Attorney General, and *W. C. Snow,* Assistant Attorney General, all of Cheyenne.

For the respondent, there was a brief by *C. M. Eby* and *Z. D. Bohrer,* of Laramie.

RINER, Justice.

The plaintiff and respondent, Eva J. Waechter, obtained a judgment against the defendant and appellant, A. E. Wilde, as State Examiner in charge of the liquidation of the First State Bank of Laramie, an insolvent corporation, in the District Court of Albany County. The record in the case comes here by direct appeal. The parties will be referred to generally as aligned in the court below. The facts to be considered in disposing of the case are very little in dispute and may briefly be stated as follows:

The plaintiff, being indebted to the First State Bank of Laramie, on February 11, 1932, sold and conveyed to that corporation some 480 acres of land situated in Albany County, Wyoming, at the purchase price of $1,440. Of this sum, $498.00 was placed to her credit in her general checking account in said bank, and $489.06 was applied in liquidation of the several notes and interest thereon evidencing her indebtedness to the institution. The balance still due plaintiff, or $452.94, was, at the suggestion of the bank's cashier, Mr. DeKay, placed in the form of two cashier's checks, each for $226.47, payable to the order of the plaintiff, and each bearing the date of the transaction above described.

It appears that the plaintiff had certain taxes to pay on March 10, 1932, and, also, that she had bought a

restaurant business, on whose purchase price she was required to make specified payments the first of each month. It was orally agreed between the bank, represented by its cashier Mr. DeKay, and S. C. Downey, one of its directors, and its counsel, and the plaintiff that the funds represented by the two cashier's checks, aforesaid, should be held by the bank solely for the purpose of insuring that the plaintiff could and would meet the above mentioned obligations of taxes and partial payments on the business. Mr. Downey, as a witness for the defendant, stated, in the course of his cross-examination, that Mr. DeKay, at the time the sale aforesaid was consummated, said to the plaintiff that, referring to the amount of money eventually evidenced by these checks, "if she would, he would prefer that she leave the money in the bank at that time and not put it into her checking account," and that it was "at his instigation and suggestion" that this money was left with the bank until it should be needed for the purposes already described.

The plaintiff, through her earnings from the business she had bought, was able to meet the required payments intervening February 11, 1932, and April 27, 1932, and, the taxes being not as yet due, there was, accordingly, no need for her to call upon the bank for the money represented by the aforesaid checks. On the date last mentioned, the institution passed into the hands of the state examiner, for liquidation as an insolvent bank. It is to be noted, in this connection, that these checks never left the bank, and came then into the hands of the state official who produced them at the trial.

On February 17, 1933, plaintiff filed with the state examiner her claim for $452.94, as a preference claim. This was rejected as such a claim on February 28 following by that official, but it was allowed as a general claim against the assets of the institution in his hands.

Subsequently, two checks, each for $22.64, were on May 6, 1933, sent to plaintiff, as the amounts due her under dividends paid, in the course of liquidation, to the bank's general creditors. These dividend checks were received by her, but under date of May 29, 1933, were returned to the defendant uncashed.

April 26, 1933, plaintiff instituted action in the district court aforesaid, to recover the amount of the two checks, and praying that this sum be adjudged a lien upon the property sold to the bank as previously related. In outline, the defendant's answer, other than a general denial, asserted that plaintiff, by retaining the dividend checks aforesaid, without cashing same, elected to receive only a general creditor's share in the assets of the defunct bank, and is estopped to claim otherwise. The affirmative allegations of the answer were put in issue by plaintiff's reply.

The case was tried to the court and the judgment entered December 11, 1933, found generally for the plaintiff and that the latter had a vendor's lien on the premises sold to the bank, for the balance unpaid of the purchase price, to-wit $452.94; adjudged that plaintiff recover of the defendant that amount, and, also, that if the same was not paid with interest and costs within thirty days of the judgment's date, the lien should be foreclosed and the property sold to make the sum due, the method of procedure in such foreclosure being duly indicated.

It is contended that the plaintiff, as a vendor, under the law of this state, has no lien upon the property sold the bank, for the unpaid portion of the purchase price thereof, she having delivered a deed and parted with title to the property. The exact question thus presented seems to be an open one in this state, but cases from other jurisdictions are cited which intimate that it is the policy of the law to look with disfavor

upon secret interests in real property or upon any principle which would tend to nullify or impair titles as shown on the public records.

The implied vendor's lien for the unpaid purchase price of real property sold, where title has passed, is a creature of the English courts of chancery. Several theories seem to exist as to its origin. Lord Eldon, in Mackreth v. Symmons, 15 Ves. Jr. 329, 33 Repr. 778, says: "The doctrine is probably derived from the civil law as to goods; which goes farther than our law." It also has been suggested that this lien was invented by the equity courts of England to meet the situation produced by the inability to subject land, by process of law, to execution for a simple contract debt. Smith v. Allen, 18 Wash. 1, 50 Pac. 783, 63 Am. St. Rep. 864, 39 L. R. A. 82.

In II Warvelle on Vendors, § 676, pp. 805-6, speaking of the nature of the implied vendor's lien, where the vendor has parted with the title to the property, the author says:

"It may be said, however, that it is usually regarded as a natural equity, which arises and exists independently of contract, and, unlike an ordinary lien, is not a specific, absolute charge upon the property, but rather a simple right to resort to the same upon failure of payment by the vendee. It is wholly independent of possession, and, unless waived or relinquished by express agreement, or by conduct plainly inconsistent with an intention of retaining it, is always presumed to continue. It is not the result of intention of either party, however, but is a sort of benevolent protection which a court raises in the interests of justice for the benefit of one who might otherwise be injured, and seems to rest upon the old principles, early recognized by the court of chancery, which grow out of the equitable doctrine of 'conscientious obligations.' "

So, Lord Eldon, in delivering his opinion in Mackreth v. Symmons, supra, extracted the kernel of the

doctrine in the following luminous sentence: "It goes upon this; that a person, having got the estate of another, shall not, as between them, keep it, and not pay the consideration."

As to the adoption in this country of this implied lien in favor of the unpaid vendor, 66 C. J. 1212-14, citing some hundreds of cases, says:

"In most jurisdictions, whether by judicial decision or legislative enactment, the right of the vendor to an implied lien for the unpaid purchase money is recognized, subject in some jurisdictions to statutory modifications or limitations."

The text then indicates that, in some few jurisdictions, the courts have declined to recognize the doctrine or it has been destroyed by express statute.

In II Warvelle on Vendors, § 676, supra, in similar vein with the text last cited, it is said:

"It is now among the best-settled principles of equity that upon every sale of real property on credit, without collateral security, a lien is raised upon the land conveyed in favor of the vendor, as a security for the unpaid purchase money, unless it has been waived by the express agreement of the parties. Thus far the authorities are united and harmonious; and while the doctrine is not of universal recognition, yet where it is permitted to obtain, and this includes a majority of the states, the rule holds absolute."

Though rendered many years ago, the decision in the case of Manly v. Slason, 21 Vt. 271, 52 Am. Dec. 60, seems of material assistance in disposing of the point under consideration. Holding that the vendor of real estate had a lien upon the property sold, for the payment of the purchase money, as against all persons except *bona fide* purchasers without notice of its nonpayment, Judge Redfield answers many of the usual objections interposed to the allowance of such a lien, some of which have been urged in the case at bar as well. He employs the following language, in part:

"We should not be prepared to say, that this lien depended upon the contract, or the probable expectation of the parties, in the outset. For if that rule were to be adopted, there would remain few cases, to which the rule would apply, as said by Walworth, Ch., in Fish v. Howland, 1 Paige 20. For if the vendor supposed there would be any necessity to resort to such lien, he would ordinarily take a formal mortgage. And it is no doubt true, that many of our citizens are wholly uninformed of any such lien; and the same is no doubt true of many other rights, which nevertheless exist, by way of lien,—as the right to refuse to deliver goods sold, until the price is paid, and the right to stop them *in transitu.* * * *

"But there can be no doubt, we apprehend, that it is a highly equitable doctrine, and eminently consistent with the most perfect notions of moral justice. It has existed in the English equity courts for centuries. It has been adopted in most of the American states, whose equity systems may be regarded as at all settled, and in the national courts. * * *

"That the existence of these liens is inconsistent with our registry or attachment laws is an objection no more formidable, than exists from the same source against most constructive or implied trusts and liens, existing in or growing out of the numerous equitable rights, peculiar to real estate, and which have nevertheless been regarded and enforced, in this state, upon the settled principles of the English chancery. An absolute deed of land, with a parol defeasance, for the security of a debt, is of this character. So are all resulting trusts, in favor of the person paying the consideration money for a deed of land, executed to some third person. * * *

"Any argument, which is attempted to be drawn from the statute of frauds, is equally applicable to the English statute. But many cases, coming, in terms, within that statute, have been saved from its operation by courts of equity. Such are cases of part performance of the contract, the deposit of title deeds, to secure a debt, &c. The payment of the price of land, before the execution of the conveyance, and the execution of the conveyance, without the payment of the

price, as well as the execution of an absolute deed, for the security of a debt, and all resulting trusts, and many others, are of this character. It has been urged, that the existence of such a lien will unreasonably clog the free circulation of property, and that it is otherwise inconsistent with our habits of business, and modes of conveyance. But such an objection, if, indeed, it be properly comprehended by the court, seems far too uncertain and indefinite to form any just ground of decision in a court of justice. We, however, apprehend no serious embarrassment will result to the community from the determination here made. * * * There is in our day, perhaps, more danger of too great and sudden departure from the ancient landmarks of the sages of the law, which have been long tried, and become easy and comfortable, in pursuit of the *ignes fatui* of modern progress and innovation."

The case of Chilton v. Lyons, 67 U. S. (2 Black) 458, 17 L. Ed. 304, was an appeal from the Circuit Court of the United States for the District of Columbia, sitting as a court of equity, and decreeing the sale of a tract of land for the purpose of satisfying the unpaid purchase money. Affirming this decree and expressing its views unhampered by state law, the court in the course of its opinion said:

"When one person has got the estate of another, he ought not, in conscience, to be allowed to keep it without paying the consideration. It is on this principle that courts of equity proceed as between vendor and vendee. The purchase money is treated as a lien on the land sold, where the vendor has taken no separate security. In the present case this lien has not been defeated by alienation to a *bona fide* purchaser, or any subsequent lien of creditors. The issue taken in the answer concerning the respondents' ability to pay out of her separate estate is wholly immaterial, except to give probability to the allegation that she had paid the consideration. The only defense taken in the answer to the claim of the bill is an alleged receipt in full or discharge for the purchase money. * * *

"Neither the answer of the party, nor the argument of counsel, allege any good reason, why a married

woman should be permitted to take property without paying for it, more than another. The disabilities thrown round her by the law, are for her protection—not to enable her to commit fraud."

There is no provision in the statutes of this state, to which our attention has been called, which in terms interferes with the operation of so beneficent a principle between the vendor and the vendee themselves. Common honesty recognizes its propriety. Being an equitable doctrine, it is administered under established equitable principles, and, as thus guarded, we can see no harm in its application in this state in a proper case.

There can be no doubt that the plaintiff never received the amount sued for in the district court. The bank never paid it over to her. At the solicitation of its officers, the sum was continually held by it until the bank's insolvency. Even the paper evidencing that sum was held by the bank itself, and never passed out of its possession. The plaintiff does not appear to have waived her rights, and, while she received and held a short time the general dividend checks of the defendant, the record is far from establishing that she intended thereby to waive her rights as an unpaid vendor. The checks were returned uncashed.

It is further contended that the defendant in this case, as a receiver for the insolvent bank and representing the general creditors thereof, has rights superior to the plaintiff, touching the claimed lien. But no decisions are cited to that effect. Our search has revealed, to our satisfaction, that the position thus taken is untenable, under the authorities.

In II Warvelle on Vendors, § 679, p. 809, the author says, with reference to the vendor's lien:

"It also prevails against assignees claiming by virtue of a general assignment under the bankrupt or insolvent laws as well as assignees under a general assignment for the benefit of creditors—such assignees, in

both instances, possessing no other or greater equities than those possessed by the debtor."

Citing 1 Perry on Trusts, § 239, in Lyon v. Clark, 132 Mich. 521, 94 N. W. 4, 5, the court said:

"The rule is also established by authority that a vendor's lien has priority over assignees in bankruptcy or insolvency, or a general assignee for the benefit of creditors."

See, also, Lavin v. Lynch, 203 Mich. 143, 168 N. W. 1024, 2 A. L. R. 804; In re Lane Lumber Co., (C. C. A.) 217 Fed. 550, 22 A. L. R. 1338-40, note.

In 1 Perry on Trusts (6th ed.), § 238, pp. 408-9, it is stated regarding the vendor's lien that:

"But the lien prevails against assignees in bankruptcy or insolvency, and against a general assignment by a failing debtor, in trust for all his creditors. In these cases the vendees are looked upon as volunteers, and, as such, they have the rights only of the debtor himself."

The same rule apparently prevails in England, as we find in 2 Sugden on Vendors 395, the following language is used:

"Persons coming in under the purchaser by act of law, as assignees of a bankrupt, are bound by an equitable lien, although they had no notice of its existence."

See, also, 22 A. L. R. 1338-40, and cases cited in the note.

No provision of our state law has been called to our attention through which the defendant would have greater rights than the insolvent bank in this matter. As a representative of the creditors of that institution, no facts appear in the record before us indicating that any one of them relied upon the record ownership of the property resting in the bank, and was misled thereby. If such a situation had been disclosed, a dif-

ferent result in the case would doubtless have followed in the court below and here.

Finding no error in the judgment of which complaint is made, it will be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.