ALBERT CONRO, JOSEPH M. WARREN, WILLIAM H. WARREN, ISAAC B. HART and GEORGE LESLEY, THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF VERGENNES, and LUCIUS A. FOOT, who sue as well for themselves, as all others similarly situated, &c.

*vs.*

THE PORT HENRY IRON COMPANY, HORACE GRAY, RALPH W. CROOKER, NATHANIEL FRANCIS, SILAS H. WEATHERBY, ROBERT B. HAZARD, ROBERT HOOPER, WILLIAM E. COFFIN, WILLIAM J. BULLARD and JOSEPH TUCKERMAN.

Where a corporation, incorporated for the purpose of manufacturing iron in all its branches, in pursuance of a *resolution of its stockholders*, made a lease of its iron works, and all its property, to its president, who owned the majority of its stock, for a period of two years and a half, and the business of the corporation was carried on by the lessee, in the same manner as before the lease was given, without notice to persons dealing with it of any change, until the failure of the lessee and his assignment of the property for the benefit of creditors, *it was held*, 1. That the lease was void for two reasons: (1.) Because it was the act of the stockholders, and not of its directors, by whom alone the corporation could act. (2.) Because the effect of such lease was to suspend the ordinary business of the corporation, for the period of more than one year, and thus amounted to a surrender of its rights, privileges and franchises, within 2 *R. S.* 463.

2. That the court of chancery, under the former system, and this court under the present constitution, had jurisdiction in such a case.

3. That the president was a trustee for the creditors of the company; and a trustee is not permitted to speculate out of the funds of the *cestui que trust.* He is not allowed to make any gain, profit or advantage from the use of the trust funds.

4. That the assignment, by the president and lessee, of the property of the corporation, for the payment of his individual debts, was a breach of trust. And the assignees, by accepting the assignment, participated in that breach of trust.

5. That the lease by the corporation, to the president, and the assignment of the same property by the latter, for the benefit of his individual creditors, were obstructions to the remedies of the creditors of the corporation, which made the case a proper one for equitable relief, independently of any statute.

6. That the case was also within the equity of the statute respecting proceedings against corporations in equity. (2 *R. S.* 463.)

7. That the corporation, after the lease to its president, continued liable to

all who had previously dealt with it, through its agents, and who continued to deal in the same way, and to whom no actual notice of a change of circumstances was given.

When the jurisdiction of equity rightfully attaches, it is made effectual for the purposes of complete relief. Having once gained possession of the cause, a court of equity will dispose of the whole matter.

A corporation is liable upon a draft drawn or accepted by a party authorized for that purpose, though the corporate name be not mentioned in such draft, if it be drawn or accepted under a name adopted by the corporation.

Notice to the agent of the corporation is notice to the corporation itself.

The tendency of modern decisions is to assimilate the actions, rights, duties and liabilities of corporations to those of individuals.

A subsequent ratification by the principal, of the act of his agent, is equivalent to an original authority.

A corporation is liable for the acts of its authorized agents, although the agent contracts in his own name, without disclosing that of his principal, if the exclusive credit be not given to the agent.

The principal and agent can not by any contrivance between themselves, release the former from his liability.

Adding the title *agent* to the signature of the drawer of a bill, is notice that the party does not mean to be personally liable.

When the principal is known he alone is liable.

Constructive notice is not enough to relieve a retiring partner from responsibility to those who had before dealt with the firm; but actual notice must be given.

Different creditors of a corporation, having a common interest in the relief sought, may unite in the same bill.

The subject of multifariousness considered, generally, and with reference to creditors' suits.

IN EQUITY. The bill in this cause, was filed in the clerk's office in Essex county, on the 26th of June, 1848, before the code of procedure went into operation. The defendants, the Port Henry Iron Company, and Hooper, Coffin and Bullard, and Joseph Tuckerman, appeared and put in their answers, without oath, the same having been waived, to which replications were regularly filed. Ralph W. Crooker appeared but did not answer. The other defendants did not appear, and the bill was taken as confessed against them. The defendants against whom it was so taken as confessed were Horace Gray, Ralph W. Crooker, Nathaniel Francis, Silas H. Weatherby, and Robert B. Hazard. In April, 1850, the cause was referred by stipu-

Conro *v.* Port Henry Iron Company.

lation to John McLean, Esq. to compute the amount due to the plaintiffs as against the defendants who suffered a default, and to take the testimony on the several issues between the other parties, and to report the same to this court. In pursuance of that stipulation a great amount of testimony was taken. The proofs were closed in September, 1850, and the cause was brought to a hearing on pleadings and proofs, at the general term of this court held at Canton, in September, 1851.

The general object of the bill was, among other things, to hold the Port Henry Iron Company liable to the payment of the debts due to the plaintiffs respectively, and the debts of others similarly situated, and to subject the property and effects of the said corporation, including the real estate assigned to the said Hooper, Coffin and Bullard, and including the personal estate, not already applied, assigned to Joseph Tuckerman in trust for the benefit of the creditors of the said H. Gray, and H. Gray & Co., so far as it might be necessary to the payment of the said debts of the plaintiffs and others, as the property of the said corporation, and to restrain the assignees from otherwise applying it, and to have a receiver appointed in the mean time.

The leading facts in the case, as they are gathered from the pleadings and proofs, are in substance as follows : The legislature of this state, on the 11th May, 1840, (*Laws of* 1840, *p.* 207,) created Horace Gray, Ralph W. Crooker, George W. Goff, Francis H. Jackson, James Jackson and such others as might be associated with them, a body corporate by the name of the Port Henry Iron Company, for the purpose of manufacturing iron in all its branches, in the county of Essex. The capital stock of the said corporation was to be seventy thousand dollars, with liberty to increase the same to one hundred and fifty thousand dollars, and to be divided into shares of one hundred dollars each. It was made lawful for the corporation, as soon as the capital stock should have been subscribed, and thirty-five thousand dollars thereof paid in, to commence business, and to conduct and carry on the same until they should find it expedient to call in the remainder of their capital. The capital stock, property and concerns of the corporation were to be managed by five

directors, who should be stockholders, and elected on the first Tuesday of June in each year. The five gentlemen already mentioned as corporators, were declared by the act to be the first directors, and they were to hold their office until others should be chosen in their places. The stock of the corporation was declared to be personal property, and assignable and transferable on the books of the company. The duration of the corporation was declared to be twenty years and no longer, and the corporation was declared to possess the powers and was made subject to the prohibitions and restrictions contained in titles 3 and 4 of ch. 18 of part 1 of the revised statutes except as modified by the charter. (1 *R. S.* 599 *to* 605.)

The capital stock of the company was subscribed to the amount of seventy thousand dollars, and over thirty-five thousand dollars were actually paid in upon the same; and the corporation was duly organized and went into operation in the business of manufacturing iron, and as incident thereto that of selling iron ore at Port Henry, in the county of Essex, in this state, on the first Tuesday of June, 1840. About the same time the said corporation purchased and acquired title in fee, from the said Horace Gray, to one or more parcels of real estate situate at Port Henry, consisting of about fourteen acres of land adapted and fitted for the site of its iron works and business operations, with a furnace thereon with appropriate fixtures, out buildings and dwelling houses belonging thereto, and of several other large tracts of land situate in the said county of Essex, in the vicinity of the said iron works, and containing a valuable iron mine already open for use in three distinct veins and ore beds, and containing a large quantity of growing wood, suitable for coal and fuel to supply the said iron works, together with a small quantity of personal property, consisting of coal, iron ore on hand, teams and implements, tools and apparatus adapted to the business purposes of the said corporation. The value of the real estate was, at that time, estimated at above forty-two thousand dollars, and the personal property at above eighteen thousand dollars, amounting in the aggregate to about sixty-three thousand dollars; all of which was paid for with the avails of the

said stock subscriptions, or accepted partly or wholly in satis-faction of the same. Horace Gray subscribed and paid for a large portion of the stock, and at the organization of the company, was elected president thereof. He continued such stock-holder and president down to the time of filing the bill. At the first distribution of stock, May 1, 1840, 330 shares of the stock were allotted to Horace Gray, 55 shares to James Jackson, 165 shares to F. H. Jackson, 110 to R. Crooker, and 40 shares to G. W. Goff. The stock was at that time divided into 700 shares, and 90 per cent was paid in, amounting to the sum of $63,000.

Several changes in the ownership of certain portions of the stock took place between the organization of the company and May, 1845, which are not material to be noticed. At the last mentioned period, Horace Gray purchased of Francis H. Jack-son his 165 shares of stock, and hypothecated the same, together with the whole or a portion of his original stock, to the said Jackson, to secure the payment thereof; which payment was subsequently made, to wit, on the 10th June, 1847, and the said Gray became the owner in his own right and for his own use, of 587 shares, Ralph Crooker of 110, Nathaniel Francis, Silas H. Weatherby and Robert B. Hazard, each of one share. Crooker owned his 110 shares from the organization of the company, and Francis, Weatherby and Hazard each one share from about May, 1845. Neither of the three latter gentlemen paid for their stock, but it was given to them by Gray. Thus it appeared that at that time, Horace Gray owned a majority of the stock, and in 1847 six-sevenths of the whole stock.

At a regular meeting of the stockholders of the company in September, 1840, it was resolved that the regular officers of the company be five directors, of whom one should be president, one treasurer, one clerk, and one superintendent, who should hold their offices for one year. Francis H. Jackson was elected the first treasurer and clerk, and George W. Goff the first superin-tendent, and Horace Gray president.

The corporation prosecuted the business of manufacturing iron and selling ore, in its own name, under the superintendence of Mr. Goff, from 1840 till 1843, when he ceased to be superin-

tendent, and parted with all his stock. The business of the company was then conducted, in its name, by James Jackson one of the stockholders, and Francis H. Jackson the treasurer and clerk, on shares, each party taking his ratable proportion of pig iron. It was so conducted until May 1845, when a new arrangement was made.

By that arrangement, the interest of the Jacksons was purchased by Horace Gray, who was to take a lease of the iron works and other property belonging to the company, at a nominal rent for two years and a half, from the first day of May 1845 ; give notice that the works were thereafter carried on in his name, and on his responsibility, and for his benefit, so that the company might not be liable for any debts thereafter contracted, in the prosecution of the works ; and pay all the debts of the company existing on the 1st of May, 1845, and all the debts which the company owed Jackson. In pursuance of that agreement a lease was executed by F. H. Jackson, treasurer, under the seal, and as the act, of the company, to Horace Gray, of all the real estate of the said company in the county of Essex, with the iron works, furnaces and buildings thereon, together with the right of use of the ore beds and woodlands ; to have and to hold the same to the said Horace Gray for the period of two years and a half from the 1st May, 1845, at a rent of one dollar a year. Gray on his part covenanted to pay the said rent, and taxes, and all charges for repairs during said lease. This lease was made in pursuance of a vote of the stockholders, at a meeting held at Gray's counting room in Boston, on the 21st April, 1845. There was no evidence that this lease was ever recorded in the county of Essex or elsewhere.

It was insisted in the bill that the defendants should be estopped to alledge that the foregoing transaction worked a dissolution of the company, or to deny that it was still in existence ; and all the defendants in their answer admitted that the said corporation was still a subsisting corporation, notwithstanding the said lease. It was alledged by the defendants that the management of the company, prior to 1845, had been attended

Conro *v.* Port Henry Iron Company.

with a great loss to the stockholders. This, however, was denied by the plaintiffs.

Horace Gray resided in Boston from the first organization of the company until his assignment on the 7th December, 1847. Shortly before the lease of May, 1845, Robert B. Hazard was employed by Gray in some agencies connected with the works, and was continued and acted as agent at Port Henry until about the 1st of October, 1846, when he was succeeded as agent by George Throop, who remained in that capacity until the assignment by Mr. Gray. During a portion of the time William J. Cutting acted as agent, in the fuel department. The funds for carrying on the business of the company, were from the commencement, derived from accommodation drafts drawn by the agent or manager at Port Henry, on Horace Gray & Co. of Boston, and discounted at the Bank of Vergennes. The firm of Horace Gray & Co. was merely nominal, Gray alone being the person upon whose responsibility the firm rested. Nathaniel Francis, the partner, put in no capital, but his services only as book-keeper. . These drafts were of various amounts but usually from $500 to $2,000 each. The amount of there discounts at the Bank of Vergennes was from thirty thousand to eighty thousand dollars a year, and for the last two years, about a hundred thousand each year. While Goff was superintendent, the drafts were drawn by him in his character as manager or agent. While the works were conducted by the Jacksons, the drafts were signed F. H. Jackson, treasurer. Subsequently, they were signed, R. B. Hazard, agent, or Wm. J. Cutting agent, according as either had occasion for funds, until Mr. Throop succeeded to the agency, when they were signed by him as agent. The responsibility of the Port Henry Iron Company was a subject of consultation among the board of directors at the time of the first and many subsequent discounts. No notice was ever given to the bank of any change in the mode of transacting the business of the Port Henry Iron Company, in 1845, or at any other time : nor was the fact of any change known to the bank or any officer thereof. Hazard, Goff, Throop and Cutting were neither of them persons of any considerable pecuniary

responsibility. The drafts were discounted upon the credit of the corporation, and the acceptor Horace Gray or Horace Gray & Co.

Subsequent to May, 1845, and prior to the 7th of December, 1847, and principally in the year 1847, Horace Gray greatly enlarged and improved the buildings and fixtures upon the real estate owned by the corporation, and for its benefit. He erected a new furnace, several new dwelling houses, a dock, and several other buildings, all of which were described in the pleadings and evidence, and were estimated to be of the value of over fifty-seven thousand dollars, and were constructed after May, 1847. It was insisted that the repairs necessary to place the works in as good a condition at the end of the lease as at the beginning, would have cost but about four thousand dollars. During the time these extensive improvements were in progress, Ralph Crooker, Hazard and Weatherby, the only remaining stockholders besides Horace Gray, were frequently present, knew of the improvements in process of construction, and made no objection. Crooker also made suggestions and gave directions in relation to them.

The debt due to the plaintiff Conro, amounting to between three and four thousand dollars, and which fell due at different times from October, 1846, to the 7th December, 1847, accrued by means of work and labor performed by him, and laborers hired by him, in and about the building and repairing some of the erections before mentioned, and for materials found, at the request of George Throop, for the use and benefit of the said corporation. In August, 1847, he received from Throop, on account of a portion of said demand then due, a draft of that date, payable four months after date for the sum of $800, drawn by the said George Throop, by the name and style of George Throop, agent, Port Henry, Essex county, New-York, upon Horace Gray & Co. Boston, Massachusetts, which was duly presented for acceptance, and accepted by the said Horace Gray & Co. but was afterwards refused payment and protested for non-payment. He received in the two following months, on different days, other drafts of the like form, on account of other in-

Conro v. Port Henry Iron Company.

debtedness of the like character, which were regularly pro-
tested for non-payment.  It was alleged in the bill, and not
denied, that these drafts were not received in payment or satis-
faction of the demands due to Mr. Conro, and that he was ready
to surrender the drafts on being paid his debt.

The claim of the plaintiffs Warren, Hart & Lesley was for ma-
terials furnished in 1847, for building and furnishing the afore-
said erections at Port Henry, and accrued between the first of
May and first of October, 1847, and amounted to above $1500.
On the 20th July, 1847, they received a draft of that date, on
account of a portion of their said demand, payable four months
after date, for the sum of $224,72, drawn by the said George
Throop by the name and style of George Throop, agent, upon
Messrs. Horace Gray & Co. Boston, Massachusetts, which after
being duly accepted was finally protested for non-payment.  In
September following they received a like draft for the balance of
their demand, which was also protested for non-payment. These
drafts were not received in payment or satisfaction, and they
were ready and willing to surrender the same as the court should
direct.

The demands of the plaintiffs, the president, directors and com-
pany of the Vergennes Bank, all of them accrued from time to
time between the 19th July, 1847, and the 7th December, 1847,
of which the sum of $31,500 was for moneys lent and advanced
from time to time to Horace Gray, by the hands of George
Throop, while the said Horace was acting as agent for the cor-
poration and carrying on the said iron works and making the
said improvements, upon drafts drawn at Port Henry, by the
said George Throop as agent, in the form and style before men-
tioned, upon the said Horace Gray & Co. Boston, and accepted
by them, in favor of the said George Throop, and indorsed in
blank by said George Throop, and which were discounted by the
bank relying in part upon the responsibility of the Port Henry
Iron Company.  The particular dates and descriptions of these
drafts were set forth in the pleadings and proofs.  They were
all duly presented for acceptance, and accepted by Horace Gray
& Co. but not being paid, were protested for non-payment.

Another portion of the demands of the bank accrued in portions between the 13th July, 1847, and the 10th November, 1847, for other moneys to the amount of $6,500, lent and advanced to the said Horace Gray while acting for the said corporation and carrying on the said iron works, and making the said improvements, upon drafts drawn at Port Henry by one William J. Cutting, then acting as another agent of the said Horace Gray, and sub-agent of the said Port Henry Iron Company, upon the said Horace Gray & Co. Boston, and accepted by them, in favor of the said Wm. J. Cutting, and indorsed in blank by him, and which were discounted by the bank, relying in part on the responsibility of the said Port Henry Iron Company. A particular description of these drafts was set out, and it was shown that they were all regularly accepted by Horace Gray & Co. and protested for non-payment.

As evidence that the drafts drawn by Throop were a charge against the corporation, it was alleged and proved that on the 8th October, 1846, and before any of the drafts now in controversy were drawn, Horace Gray & Co. addressed a letter to the cashier of the Bank of Vergennes, stating that they had authorized Mr. George Throop, *as agent of the Port Henry Iron Works*, to draw upon them from time to time, and that his drafts to an amount not exceeding ten thousand dollars, beyond any accepted drafts at any one time, should be honored on presentation.

The moneys loaned and advanced by the Bank of Vergennes upon the drafts so drawn by Throop and Cutting were immediately, and as fast as received, applied by them respectively to the use and benefit of the said Port Henry Company, in making the aforesaid improvements and fixtures, and in paying for labor and materials and other costs and expenses thereof, or otherwise for the benefit of the said company.

Another portion of the demands of the said Bank of Vergennes accrued between the 20th July, 1847, and 13th November, 1847, for moneys advanced and paid from time to time upon eight several drafts, drawn by the said George Throop as agent, in the form and style above stated, upon the said Horace Gray

& Co. and accepted by them, seven of them in favor of Nathan S. Clark and indorsed by him to the said bank for the accommodation of the said Horace Gray, who was then carrying on said iron works as aforesaid, and one drawn in favor of Myron Clark and indorsed by him in manner aforesaid, which drafts were particularly described in the pleadings and were given in evidence; all of which were duly accepted by Horace Gray & Co. but were refused payment and protested for non-payment, and were ready to be given up on the bank being paid therefor. These drafts were drawn and delivered, seven of them to Nathan S. Clark, and one of them to Myron L. Clark, for work and labor rendered and materials found by the said Nathan S. Clark in and about the building and running of six canal boats at or near the Port Henry Iron Works at Port Henry, in the year 1847, for the use and benefit of the said corporation, in pursuance of a contract made between the said Horace Gray, acting as was alledged as agent of the said corporation and for its use and benefit, and which said boats, the plaintiffs claimed, were at the time of the assignment made of the estate of the said Horace Gray, in Dec. 1847, the property and effects of the said corporation. The moneys so advanced by the said bank upon said drafts were applied to the building of the said boats and materials found, and for running the same for the use of the corporation of the Port Henry Iron Company.

Another portion of the demands of the Bank of Vergennes accrued between July 20, 1847, and November 8, 1847, for moneys advanced and paid from time to time upon three other drafts drawn by the said George Throop as agent, in the name, form and style aforesaid, and which were particularly described; all of which were in favor of Dennison Willard, and indorsed by him to the said bank and protested for non-payment. The proceeds of these drafts were applied in payment of labor performed by him on the Port Henry Iron Works and the premises connected therewith, for the benefit of the said corporation, and which original demands had been assigned to the bank.

Another portion of the demands of the said bank accrued between 11th August, 1847, and 7th December, 1847, for moneys

advanced and paid upon six other drafts drawn at Port Henry by said George Throop as agent, in the same form, upon Horace Gray & Co., in favor of different individuals, and indorsed by them to the said bank, the proceeds of which were applied for the benefit of the said Port Henry Iron Company, which drafts had been protested for non-payment.

Another portion of the demands of the bank accrued between the 5th August and 9th September, 1847, for moneys advanced upon other drafts drawn at Port Henry by the said George Throop as agent, in the same form and style, upon Horace Gray & Co., and accepted by them in favor of Lewis A. Foot, and by him indorsed to the bank. The drafts were principally for drawing ore, chopping wood, &c. and other work and materials for the said Port Henry Iron Company. These drafts were duly accepted, and protested for non-payment.

The plaintiff Lewis A. Foot had a demand against the Port Henry Iron Company which accrued between the 1st May, 1847, and December 1, 1847, in drawing ore, and cutting and drawing wood, for the said iron works, while the works were carried on as aforesaid, on account of which he received several drafts drawn by George Throop as agent, on Horace Gray & Co., in the style and form aforesaid, and which were particularly described, which were accepted by Horace Gray & Co., and afterwards protested for non-payment.

In none of the before mentioned cases were the drafts received in payment or satisfaction of the indebtedness, nor was there any agreement that they should be so received. In all the cases above specified the several parties to the drafts were regularly charged in their capacities as drawers, indorsers and acceptors, and the several drafts were held ready to be delivered up when ordered by the court.

It was stated that there were a large number of other creditors of the Port Henry Iron Company, whose debts were contracted during the period of time while the works were conducted and carried on by Horace Gray in manner aforesaid, who had similar interests with the plaintiffs in the subject matter of this bill and the relief sought, and who were entitled to come in as

Conro v. Port Henry Iron Company.

parties plaintiffs, to contribute their share of expenses, &c. and that the bill was filed as well in favor of the plaintiffs as of such persons, &c.

In November, 1846 Horace Gray made the purchase of what is called the Stone property, from James S. Whallon.  It consisted of about 160 acres of land, and was contiguous to the other real estate of the Port Henry Iron Company, and some of the erections and improvements made by the said Horace Gray, before mentioned, were upon this purchase.  The sum paid was $7,500, of which one thousand dollars was paid in iron ore from the Cheever bed delivered at the dock in Fort Henry, and the residue was paid by drafts drawn by George Throop as agent on Horace Gray & Co. and negotiated by Whallon through the Bank of Vergennes.  The contract of purchase was negotiated by George Throop and Mr. Whallon, and the bargain completed in Boston by Mr. Gray.  The deed was made directly to Gray by his orders, addressed to Mr. Throop, and after the completion of the bargain, Gray informed Mr. Crooker that *they* had purchased the Stone property.  It was insisted that this purchase was made for the Port Henry Company as a corporation, and paid for with its funds, and was as between that company and its creditors, the property of the corporation.  This was denied by the defendants in their answer, but without oath.  The proof showed that there was no distinction made between that and the other property after the purchase.  It was all used for the common purposes of the company, and the dwelling houses on the Stone purchase were used by the persons employed in the business of the establishment.  The office of the company was erected on that purchase, and occupied by their clerks.  And there was no discrimination on the books between the expenses for the repairs on the original property of the company, and that put upon the Stone purchase.  The accounts were all indiscriminately blended.  The drafts given to Mr. Whallon in payment, and which were subsequently paid, were in the same form of all the other drafts drawn by the agent in the prosecution of the works.  The weight of evidence was that the purchase was for

the company, and intended to form a part of the establishment, and was paid for with its funds.

It was insisted on in the bill, and established by the proofs, that subsequent to May, 1845, Horace Gray or Horace Gray & Co. acted as the agents for the Port Henry Iron Company; that Hazard and Throop were mere sub-agents, and the agents actually at the works, and that the several drafts were drawn, and the business of the company was done in the particular form and manner above stated, as a convenient mode of carrying on the business for the benefit of the said company; that when the Vergennes Bank discounted the said drafts, they verily believed that the Port Henry Iron Company was responsible as drawer, acceptor, or in some other way; in short that Horace Gray, Horace Gray, & Co. and the Port Henry Iron Company, meant one and the same thing. Although Mr. Gray gave directions to have a new set of books opened at the works, and they were accordingly opened about the 1st of May, 1845, in the name of Horace Gray, lessee Port Henry Iron Company, it nowhere appeared that any notice of the change was given to persons previously dealing with the company, or that the fact of such change obtained any considerable notoriety. A large proportion of the bills presented against the concern, after May, 1845, were drawn as against the Port Henry Iron Company, without any allusion to any change of its mode of doing business, and were paid by the officers of the company without objection, and filed by them. Out of about eleven hundred orders during the same period, only seven or eight were drawn on Horace Gray, lessee, or on Throop or Hazard as agents of Horace Gray, lessee; all the rest were drawn on the company by its corporate name, and were paid without objection. Shipping lists were presented in the same form, by Warren, Hart & Leslie: and indeed the great mass of business transacted at Port Henry seemed to have been under the name of the company, in the same manner as prior to May, 1845.

About the 22d of November, 1847, Horace Gray and Horace Gray & Co. became insolvent, and certain proceedings were instituted against them, in behalf of their creditors, in Massachu-

Conro *v.* Port Henry Iron Company.

setts, and such proceedings were had that the defendants Hooper, Coffin and Bullard were appointed assignees or trustees of the said Gray & Co., and on the 7th of December, 1847, all the estate real and personal of the said insolvent debtors, including all in which they had any interest, on the 24th of November, 1847, except exempt articles, was vested in the said assignees, for the benefit of their creditors at large.   On the 16th of December, 1847, Horace Gray conveyed in fee to the said trustees the Stone purchase, so called, by metes and bounds, upon trust to sell and dispose of the same, and with the proceeds thereof, first to pay the costs and expenses of the sale and executing the trust, and the residue to the payment of the debts of the said Horace Gray, in proportion to their several amounts.

On the 23d November, 1847, Horace Gray assigned to the defendant Joseph Tuckerman, of the city of New-York, all the pig iron, fuel, ore, and other personal property belonging to the said Horace Gray at Port Henry, or on the way to or from the said works, together with the wood on the shore of Lake Champlain, and his share in the towboat Ethan Allen, in trust, first to continue the works at Port Henry in full operation for the term of six months from the date of said deed of assignment, and to sell the pig iron made from the same as fast as received, either for cash or for credit as he should deem best for the interest of the creditors of the said Horace Gray and Horace Gray & Co., and out of the proceeds thereof, after deducting the costs and charges of bringing the same to market, pay the wages due to the operatives at the said works at the time of the date of the said assignment, and the expense of the manufacture thereof, and secondly, after deducting charges and commissions of the assignee, to divide the residue ratably amongst the creditors of the said Horace Gray individually ; and in case the same should exceed the debts of said creditors, then to pay such excess to the creditors of Horace Gray & Co. ratably.

The property which Tuckerman took into his possession under the assignment, and which the plaintiffs claimed belonged to the Port Henry Iron Company, amounted in value to 25,000 or 30,000 dollars, an inventory of which was set out by Tucker-

man in his answer. The assignee, Tuckerman, accepted the trust, took possession of the property, run one of the furnaces for the space of six months, sold all the iron on hand at the time of the assignment, and the iron since made, except portions of it sold to the operatives for their wages, being the first debts provided for in the assignment, and was proceeding to fulfill the trust, when stopped by the injunction in this cause, and the appointment of a réceiver.

About the time of his failure, Horace Gray was interested in several iron establishments, besides the one at Port Henry, and particularly in one at Saugerties, Ulster county, another in the state of New Jersey, another in the state of Maine, another in Boston or its vicinity, and had at that time large and extended dealings; and he and the firm of Horace Gray & Co. were largely indebted in those places to creditors not dealing with him, nor trusting to the responsibility of the Port Henry Iron Company. The property of Horace Gray and of Horace Gray & Co. would not prove sufficient to satisfy and discharge all their creditors at large. The property of Nathaniel Francis was small and would not supply the deficiency.

It was alledged by the plaintiffs that all the personal property on hand at the iron works at Port Henry, at the time of Gray's failure, had been made, produced and procured with and out of the property and effects of the Port Henry Iron Company, and out of the income and profits of the iron works and ore beds, and was claimed by them to be the property of the Port Henry Iron Company, and not of the said Horace Gray, and ought in justice and equity to be applied, as well as the aforesaid real estate of the said company, to the payment and satisfaction of its debts and liabilities, and especially to the debts of the plaintiffs and those standing in the same relation; and that the property called the Stone purchase, was equitably the property of the said corporation, and ought to be applied as such to the payment of its debts. These allegations were controverted by the defendants, the Port Henry Iron Company, and Mr. Tuckerman, in their respective answers. The determination of this issue, except as to the Stone property, depended in part upon disputed

Conro *v.* Port Henry Iron Company.

facts, and in part upon legal conclusions, deducible from facts which were established beyond controversy.

The value of the real estate of the Port Henry Iron Company, together with the Stone purchase, was estimated to be about $100,000, but it was supposed it would not bring, at a public sale, above $75,000, and not more than sufficient, together with the personal property and the avails thereof still remaining in the hands of Tuckerman, and unapplied by him, to satisfy the debts and liabilities of the Port Henry Iron Company, including the demands of the plaintiffs and of those similarly situated.

Hooper, Coffin and Bullard claimed, under the assignment to them, to control the iron works and ore beds, and other real estate of the corporation, for the uses of the said assignment. On the 10th December, 1847, Gray assigned to them 590 shares in the said Port Henry Iron Company, upon the same trusts as they held the property transferred to them in Massachusetts. Under the above, they claimed the right to sell and dispose of the interest which Horace Gray had in the said company as stockholder thereof; and for the purpose of protecting their interest they had appointed an agent at Port Henry. They claimed also to hold the Stone purchase as part of the property of Gray conveyed to them as aforesaid, and they denied that that purchase was a part of the property belonging to the Port Henry Iron Company.

All the defendants insisted that the plaintiffs had not, by their bill, made such a case as entitled them to any relief against the defendants in a court of equity, and they prayed the same benefit as if they had demurred to the said bill. The plaintiffs, on the other hand insisted that as the number of claimants, standing in the same relation, and having a common interest in the relief sought, was great, the bringing of separate actions would be attended with difficulty and vexation; and would be oppressively expensive.

The nature of the relief sought has already been intimated. It was, in short, for an account of the plaintiffs' debts, and of the interest of the Port Henry Iron Company in the aforesaid real and personal property, including the Stone purchase; and

that the said company might be decreed liable to pay the debts of the plaintiffs, and of all others similarly situated, who might choose to come in and contribute their shares to the expense of this suit; that the personal property assigned to Tuckerman might be declared to belong to the corporation, and liable to its debts, and the Stone purchase also; and that all the estate of the said corporation, real and personal, might be decreed to be liable for the aforesaid debts and demands in preference to the debts and demands of other creditors at large of the said Horace Gray, not similarly situated and interested with them, and that the said corporation might be decreed to pay to the plaintiffs their respective debts. It prayed also for a receiver and an injunction; both of which were granted pending the suit. And it prayed also for other or further relief.

*G. A. Simmons* and *H. H. Ross*, for the plaintiffs. I. The Port Henry Iron Company, and not Gray, were the principal, by and for whom the business was conducted and the debts contracted for which the drafts were taken. The Port Henry Iron Company were the real principal, contracting the debts in their own name, proper or adopted by their own officers and agents, and for their own use and benefit. (*Story on Ag.* §§ 52, 53. 2 *Kent's Com.* 291, 2d ed. *Ham. Pr. & Ag.* 236, 237. 12 *John.* 300. *Paley on Ag.* 312. *Story on Ag.* §§ 54, 56, 89, 90, 253, 260, 254, 255, 440 a, 451. 3 *Cowen,* 281. 5 *Hill,* 137. 26 *Wend.* 192. 8 *Cowen,* 60. 18 *John.* 44. 4 *Cowen,* 659. 3 *Comst.* 151. 4 *Paige,* 127.) (1.) The drafts were drawn after the 1st July, 1847, by G. Throop, agent, on H. Gray & Co., for moneys, goods, wood and other things used at the works, and in payment for property for the company, and labor and materials done and provided in making valuable additions and permanent improvements. Proof of executing, indorsing, accepting, protesting and notice was given. Actual and particular notice must be given to old customers, and constructive notice to new ones. (5 *Esp.* 76.) (2.) The business was conducted after May 1st, 1845, by Gray and Crooker, the managers appointed by the board, and the other officers, agents and servants of the corpora-

Conro v. Port Henry Iron Company.

tion, at their offices and works, under their signs. (3) The stock on hand was used. The funds were raised and disbursed as before, additions to the property and valuable permanent improvements were made under the direction, and with the knowledge and assent of the president and all the directors and stockholders, and with the company funds and profits. (4.) H. Gray always controlled the business of the corporation and their real estate. There was no change in the accounts or business, after June 10th, when Jackson was paid up, nor after the termination of the lease, nor after Gray's failure. (5.) Bills made, and notes and receipts given at the office, and notices as posted in the name of the company, contracts made in the company name by the president and other officers, and other acts done and declarations made by them recognizing the corporation as principal. (6.) The debts were contracted, business carried on and improvements made for the use and benefit of the Port Henry Iron Company; for Crooker was to receive his share of the profits, and was privy to all the arrangements, before and after the lease, and consented to them. II. The Port Henry Iron Company were the ostensible principal, and obtained credit from the plaintiffs and others, without notice of any other principal. (*Story's Ag.* §§ 443, 4, 127, *note*, 89 *to* 93, 27. 1 *Story's Eq. Jur.* §§ 385 *to* 392. 1 *Chit. G. P.* 443, 444. *Paley's Ag.* 187. 2 *K. C.* 644. 22 *Wend.* 384. 23 *Id.* 18. 5 *Hill*, 101. 4 *Cowen* 465.) (1.) The course of their business was not changed, the iron and ore was consigned to the same persons, and the avails applied to the payment of drafts, &c. The lease was never published, notice was never given to the plaintiffs of a change of business, nor published in any way. (1 *Hilliard*, 367.) If any notice could be inferred, sufficient to put the plaintiffs on inquiry, it would have led to the same results. The use of the word lessee, had no intelligible definite meaning. It is admitted that if the creditors knew of the lease, and trusted to Gray alone, the action would not lie. (2.) The corporation held themselves out as principal by making drafts, &c. in the same form, under the same control, at the same offices, and under the same signs, by notice to wood choppers, by making out accounts in the company's name, and giving receipts,

&c. and by other acts and declarations of the stockholders, officers, agents and servants of the company. (3.) By their dealings, by receiving bills, accounts, receipts, shipping lists, orders, letters, &c. without objection or notice, individual or public. (4.) By the application of the funds and profits for the use of the corporation in improvements, and extending the lands and works and other facilities for business under the direction and inspection of Gray and Crooker. (5.) It was so considered by the agents and clerks and by business men generally. (6.) The debts of the plaintiffs were contracted, and the drafts taken, on the credit and for the use of the corporation, as well as the debts and drafts of others, and with their knowledge, without objection. (*Paley on Ag*. 163, 164, 171, 172. 2 *K. C.* 616. 10 *Paige*, 127. 3 *Comst.* 151. *Story on Agency*, §§ 140, 140 *a*, 451.) III. If in any cases they were not the *ostensible*, they were still the *real* principal, furnishing the capital and receiving the profits. If in any cases the corporation were not the ostensible principal, this was because they and H. Gray, so transacted their business as to hold themselves out as one and the same thing, and the company are holden for all debts so contracted for their benefit. (16 *Pick. Rep*. 412.) The fact that Warrens, Hart and Lesley and Foot, made out some of their bills in the name of H. Gray lessee, is not conclusive evidence that the credit was not given to the corporation. (*Story on Ag*. § 289.) Even if the credit was given to Gray, but without notice that the Port Henry Iron Company were the real principal for whose benefit the debts were contracted, they are still holden. (*Story on Ag*. § 446.) If the debts or any of them, were not contracted in the name of the corporation, yet by accepting the profits and benefits of them, they have adopted them as their own. The debts were contracted for the use and benefit of the corporation, partly for their ordinary business, and partly for the additions and permanent erections and improvements made under the directions of their officers, &c. The additions and improvements were made by the labor of the plaintiffs' materials furnished, and moneys loaned by them, and by the use of the profits after May 1, 1845. The profits after May 1, 1845, amount to over $82,000.

The improvements amount to over $71,000, and with the Stone purchase, over $79,000. The profits of the ordinary business since May, 1845, exceed the amount of the debts outstanding, which were contracted in the same time. The outstanding debts are the claims of the plaintiffs and others similarly situated. Nearly all the improvements were made, and all the plaintiffs' debts contracted since June 10th, 1847, when Jackson was paid off. A large proportion of the improvements were made by the use of the plaintiffs' labor, materials and money loaned. The old losses, if any, can not affect the rights of parties in this action. The plaintiffs say there was no loss before May 1, 1845. The previous indebtedness of the corporation to H. Gray, if any, can not be considered, at any rate in this stage of the suit. The works were run, the debts contracted and applied, and improvements made, with the knowledge and consent of the corporation. The whole course of the business and all the testimony show that Gray and Crooker and Francis, the principal proprietors and officers, conducted the business and improvements. (3 *Comst.* 151. *Story on Ag.* §§ 140, 140 a 451. *Paley on Ag.* §§ 172, 125, 312. 2 *Kent's Com.* 616. 1 *Lev.* 396. 10 *Paige*, 127. *Story on Ag.* §§ 64, 66, 84, 89, 94. 289, 290, 270, 207, 446, 446 a.)

IV. At any rate Gray's liability, if any, is only cumulative to that of the company, and not exclusive. (1.) Credit was not given to him exclusively, if at all. (2.) The plaintiffs did nothing either in creating the debts or taking the drafts, amounting to an election to charge Gray, or Gray & Co. and exonerate the corporation. (3.) The drafts were not taken in payment, and are ready to be delivered up on obtaining satisfaction for their consideration.

V. The Stone purchase conveyed to Hooper and others, and the personal property assigned to Tuckerman, and the avails thereof, are the property of the Port Henry Iron Company, having been produced and paid for by their funds. (1.) The Stone property was purchased for the corporation and paid for out of their funds, and intended for their benefit. (2.) H. Gray assigned to Tuckerman all the pig iron, fuel, ore, and other personal prop-

erty at Port Henry, or on the way to and from the said works, together with the wood on Lake Champlain, November 23d, 1847.

VI. The suit is properly brought in this court by the creditors collectively, and the stockholders and assignees are properly made parties, on the ground of their individual interest and as trustees of creditors. (1.) The suit properly brought in equity. (*Story on Ag.* § 162.) (2.) And against the corporation, &c. (*Story on Ag.* § 162. 9 *Cranch*, 153. 4 *Wend.* 285.) (3.) By the plaintiffs for themselves and others. " Some creditors may sue for all when they all have a common interest in the relief." (*Story's Eq. Pl.* §§ 90, 101 *to* 103. *Ed. Tr.* 168. *D. P.* 334. *Welf. Eq. Pl.* 56. 10 *Paige*, 290, 592. 7 *Id.* 294.)

VII. The plaintiffs are entitled to a decree against the Port Henry Iron Company for their own debts and those of others similarly situated, either on the drafts, or for the moneys and other things, which they were given for, and for the usual reference in such cases.

VIII. The plaintiffs are entitled to have the property and effects of the corporation applied to the satisfaction of their debts under the decree in this suit, and for the usual reference in such cases. (1.) The corporation is suspended and liable to be dissolved, and all parties interested are before the court. (2.) Or if any other proceeding is necessary to apply the corporate property to the payment of its debts, that can be done by a supplementary order at the foot of this decree.

IX. The plaintiffs are entitled to their costs to be paid by the defendants personally, and not out of the fund.

*G. W. Morris,* for the defendants. I. The testimony of Geo. W. Goff, Hiram Newell, William H. Warren and Albert Conro ought to be stricken out. (*Sec.* 399 *of amended Code. Laws of* 1849, *p.* 692.) And all the evidence as to the acts of the clerks in Gray's establishment at Port Henry, not known to the company, should be stricken out, as the plaintiffs were not misled by such acts ; they not being aware of them.

II. The Port Henry Iron Company have never been dissolved, and are still solvent and entitled to all the rights secured to

Conro *v.* Port Henry Iron Company.

them by their charter. (*Thompson* v. *The N. Y. and Harlem Railroad Company*, 3 *Sand. Ch. Rep.* 625, *and cases therein referred to.*)

III. The corporation being allowed to hold real estate, the power of leasing was necessarily conferred upon the company, as incidental thereto. (2 *Kent's Com.* 227, 228, *of the first ed., and the authorities referred to in the notes.*)

IV. Although by the by-laws the directors had power to make such a lease as that to Gray, (such lease to be confirmed by the stockholders at a regular meeting,) still the stockholders could pass a resolution directing a lease to be made in the first instance, and especially when the directors were present, voted for, and made no objection to it. (*Brady* v. *Mayor of Brooklyn*, 1 *Barb. S. C. R.* 584. *Bank of Columbia* v. *Patterson*, 7 *Cranch*, 299. *Mott* v. *Hicks*, 1 *Cowen*, 519.) Corporations may bind themselves by resolution. (*Bank of U. S.* v. *Dandridge*, 12 *Wheat.* 68.)

V. The stockholders had a right to alter and amend the by-laws at any time, as well as make them originally. And their act of 21st April, 1845, authorizing the said lease, was an alteration or amendment of the by-laws, pro tanto. And they had a right, at a corporate meeting, to make an original contract of any kind, by vote or resolution. See *sec. 2 of ch.* 7, *Angell & Ames on Corporations*, where the point is discussed.

VI. The said lease was beneficial to, and binding on the company. Gray having paid a large equivalent therefor, by assuming and paying their debts. (*Aspinwall* v. *Meyer*, 2 *Sandf. Sup. C. R.* 180.) And it was a valid and sufficient hiring, even without a lease, or if the lease were void. (*Wood* v. *Tate*, 5 *Bos. & Pull.* 246. *Doe* v. *Woodman*, 8 *East*, 228. *Ang. & Ames on Corp. ch.* 7, § 7.) And the credit was given to Gray, the bona fide lessee of the works, and not to the company, and after the lease was made, the company did not and could not interfere.

VII. The company, on the 1st of May, 1845, having leased their works to Gray, and entirely suspended their operations at Port Henry, did not make themselves liable, by neglecting to

Conro *v.* Port Henry Iron Company.

give notice to their former dealers, the want of notice being merely a badge of fraud, and to be rebutted by evidence of the fairness of the transaction, and the bill does not proceed on the ground of fraud, but on the ground of contract. And the lease being for less than three years, it was not necessary to record it.

VIII. The best possible legal notice was given by Horace Gray, by informing the parties personally or by letter through himself or his agent, that he was the lessee of the works, and the persons employed at the works were his agents.

IX. The bills of exchange discounted and held by the Vergennes Bank were not loans to any one, and certainly not to the Port Henry Iron Company. They were discounts and purchases of negotiable paper by a bank incorporated for that purpose, and the remedy of the bank is confined to the paper, to which the Port Henry Company was not a party. (*Fenn* v. *Harrison*, 3 *D. & E.* 757. *Fidel* v. *Clark*, 3 *Esp. N. P. Ca.* 474. *Emly* v. *Lyle*, 15 *East*, 7. *Lloyd* v. *Freshfield and Keye*, 2 *Carr. & Payne*, 320. 12 *Com. Law Rep.* 149. *Same case in King's Bench*, 9 *Dow. & Ryl.* 19. 22 *Com. Law Rep.* 382.) Principle of foregoing cases recognized, and cases approved, particularly *Emly* v. *Lye*, in *Pentz* v. *Stanton*, (10 *Wend.* 271;) *Whitbeck* v. *Van Ness*, (11 *John. Rep.* 409, 414;) *Frisby* v. *Larned*, (21 *Wend.* 453;) *Allen* v. *Coit*, (6 *Hill*, 320.)

X. Robert B. Hazard, George Throop and William F. Cutting, being the agents of Horace Gray, and not of the Port Henry Iron Company, the said company can in no way be liable to the said bank, either as drawers or indorsers. (*Same cases as upon last point, and also Jacques* v. *Marquand*, 6 *Cowen*, 497. *Collyer on Part.* 6, *by Perkins*, § 477. *Bank of U. S.* v. *Vinney*, 5 *Mason's C. C. R.* 176. *Le Roy, Bayard and Comp.* v. *Johnson*, 2 *Pet.* 186. *Kilyour* v. *Finlayson*, 1 *H. Black. R.* 155.)

XI. If the bank had intended to hold the company liable, either as drawers or indorsers, notice of the dishonor of the bills should have forthwith been given to the company.

XII. The greater portion of the iron made by Gray during the lease having been used by himself, or at his other establish-

ments, became blended in his general property, and should be divided equitably among all his creditors. The company never accepted nor consented to the improvements in their corporate capacity, nor by their authorized agents, acting as such. No assent of the individual stockholders could bind the company. (*Ang. & Ames on Corp. ch.* 7, §§ 4, 8. 10 *Mass. R.* 397. 11 *Verm. R.* 19.)

XIII. The Stone purchase having been paid for by Horace Gray & Co., belongs of right to the assignees of the creditors at large.

XIV. Even if the whole transaction between Gray and the company was fraudulent, the creditors at large are entitled to the proceeds of said property, they having trusted to the whole capital of Gray & Co., by which the improvements were made and paid for, and the plaintiffs having known with whom they were dealing. The plaintiffs have not acquired any priority or lien over the other creditors.

XV. All the iron manufactured by Tuckerman at Port Henry was from the general funds of Horace Gray & Co., and ought to be divided according to the terms of the assignment.

XVI. No proceedings having been taken until the 23d of June, 1848, when Tuckerman had proceeded with and almost concluded his duties under the assignment, he should be protected by this court in its decree.

XVII. The assignment to Hooper, Bullard and Coffin, being for the benefit of the creditors at large of Horace Gray, and Horace Gray & Co., and giving no preferences, is entitled to the special favor of this court in a suit like this, addressing itself to its equity, and brought for the purpose of giving a preference to the plaintiffs.

XVIII. The bill is demurrable. (1.) There is no ground for the equitable jurisdiction of the court; the bill being evidently framed to invoke the equitable and not the common law jurisdiction of the court. The remedy of the plaintiffs individually was complete at the common law, and was as full and ample there as in equity. (2.) The bill is multifarious, and no decree whatever can be rendered for these plaintiffs, who are suing in

distinct rights. They have no joint interest, and a decree can not be rendered for them all, and in this joint suit a decree can not be rendered for any one of the plaintiffs separately. (*Dunn* v. *Dunn*, 2 *Simons*, 329. *Maul* v. *Acklon, Id.* 331, *and the cases cited there. Story's Eq. Pl.* §§ 271, 272, 279. 8 *Pet.* 123. 7 *Paige,* 583. 1 *Mylne & Keen,* 546.) These authorities refer to the first subdivision as well as the second.

*By the Court,* WILLARD, P. J. From the facts disclosed in this case, it is obvious that the plaintiffs have meritorious claims for advances of cash, labor and materials, which ought to be reimbursed by somebody. The objection to their recovery does not rest so much upon the doubtful nature of the demands sought to be enforced, as to the *species* of relief which has been invoked, and the *number of parties* who have been united as plaintiffs and defendants. The objections strike rather at the *form* of the procedure, than at the *merits* of the claims.

I. Leaving these objections of *form* to be noticed hereafter, we will proceed to show, first, that the Port Henry Iron Company, as a corporation, and not Horace Gray or Horace Gray & Co. was the principal by and for whom the business was conducted and the debts contracted, for which the several drafts were drawn. There is no dispute, that from the first organization of the company in the spring of 1840, until the spring of 1845, the corporation was responsible for the acts of its officers. During that period, it acted through the agency of individuals, and raised its funds through the medium of drafts on Horace Gray & Co., drawn by the persons intrusted with the management of its affairs at Port Henry, and negotiated through the Bank of Vergennes. Had payment of these drafts been refused, it can not be doubted that the Port Henry Iron Company, by whom the funds were received, on discounting the drafts, would have been liable, either as drawers of the drafts, or on surrendering these for the cash so advanced. To create that liability in the corporation, it would not have been necessary, on the drafts being protested for non-acceptance or non-payment, to have given any other notice thereof than to the agent by whom they were drawn. Corporations act

through their agents, and the tendency of the modern decisions is to assimilate their actions, rights, duties and liabilities to those of individuals and commercial partnerships. (*See Bank U. S.* v. *Dandridge,* 12 *Wheat.* 64.) Notice to the agent is notice to the principal. (*Paley on Ag. by Dunlap,* 262 *and notes. Story on Ag.* § 140 *d.* McEwen v. *The Montgomery Mut. In. Co.* 5 *Hill,* 101. *Allen* v. *Coit,* 6 *Id.* 318. *Angel & Ames on Corporations,* 199. 2 *Kent's Com.* 289, 290 *et seq. The Bank of Columbia* v. *Patterson,* 7 *Cranch.* 299. *Fleckner* v. *United States Bank,* 8 *Wheat.* 338.) To create a liability in the Port Henry Iron Company as a corporation, it is by no means essential that the corporate name should be used in the drafts. It is enough that they were drawn or accepted under a name adopted by them, by a party authorized for that purpose by the company. That authority need not be in writing, nor proved by a resolution of the board of directors. It may be shown by the conduct of the officers of the corporation, their ratification of it by paying drafts so drawn, or by other acts of an unequivocal character, indicating their assent thereto. (*See cases supra.*) A subsequent ratification is equivalent to an original authority. (*Moss* v. *The Rossie Lead Mining Co.,* 5 *Hill,* 137. *Story on Ag.* 293, § 244. *Rogers* v. *Kneeland,* 10 *Wend.* 218, *affirmed in error,* 13 *Id.* 114. *Moss* v. *Mc-Collough,* 7 *Barb.* 279.) Nor would the liability of the company be varied, although it should appear that its agents, acting within the scope of their authority, contracted in their own name without disclosing that of the principal. If in such case the exclusive credit be not given to the agent, the principal is also liable. (*Story on Ag.* § 446.) The principal and agent can not, by any contrivance between themselves, release the former from his liability. (7 *Taunt.* 295.) And when the contract is made with the agent, and the name of the principal is not disclosed, the latter is not absolved from the contract ; for in such a case, as the principal is not known, it can not be said that the party has made his election not to trust the principal, but exclusively to trust the agent. (*Story on Ag.* §§ 446, 266. *Thompson* v. *Davenport,* 9 *B. & C.* 78. *Higgins* v. *Senior,* 8 *Mees. & Welsb.*

833.) In all such cases, both the principal and agent are respectively liable. Adding the title " *agent* " to the signature of the drawer of a bill, is notice that the party means not to be personally liable, and when the principal is indorser he alone is responsible. (*Hicks* v. *Hinde*, 9 *Barb.* 528.)

If such be the law with respect to transactions *prior* to the lease of May, 1845, the same rule applies to all subsequent transactions with parties dealing with the corporation before that time, and to whom no actual notice of a change of circumstances has been communicated. With respect to those dealing with partnerships, constructive notice of a dissolution is not enough to relieve a retiring partner from responsibility to those who had before dealt with the firm, but actual notice must be shown. (*Graves* v. *Merry*, 6 *Cowen*, 705. *Vernon* v. *The Manhattan Co.* 17 *Wend.* 524. *S. C. in error*, 22 *Id.* 191. *Wardell* v. *Haight*, 2 *Barb. S. C. Rep.* 549.) This rule applies in all its stringency to the Port Henry Iron Company. It continued liable to all who had before dealt with it through its agents, and to whom no actual notice of a change of circumstances was given. The Vergennes Bank had dealt with the company from its first organization, and was entitled to *actual notice*. Most of the other plaintiffs, if not all, had been its customers before, and fall within the same rule.

It has been said already that no notice was ever given to the Vergennes Bank. There is some evidence that Warrens, Hart and Lesley had notice, arising from the fact that some of their bills were made out against Horace Gray, lessee. It is repelled by other circumstances. And after considering the various facts which are referred to as evidence of notice to the Vergennes Bank, we think they are not sufficient to warrant the conclusion that actual notice was given to any of the plaintiffs.

The objections on the part of the defendants to a recovery against the company *on their bills of exchange, as such*, is one of form rather than of substance. It overlooks the fact that the plaintiffs also claim to recover for the considerations for which the bills were given, proposing at the same time, to surrender up the bills under the direction of the court. It nowhere ap-

pears that the bills were received in payment and satisfaction of the demands for which they were given, and unless they were so received, the plaintiffs, on surrendering the bills, are remitted to their original demands. (*Burdick* v. *Green,* 15 *John.* 247. *Hughs* v. *Wheeler,* 8 *Cowen,* 77. *Whitbeck* v. *Van Ness,* 11 *John.* 409. *Frisbie* v. *Larned,* 21 *Wend.* 450. *Peters* v. *Burity,* 10 *Pet.* 532.) In *Finn* v. *Harrison,* (3 *D. & E.* 757,) and *Emly* v. *Lyle,* (15 *East,* 7,) the bills were discounted *solely* on the credit of the parties whose names appeared upon the paper. The present question could not arise. In *Pentz v. Stanton,* (10 *Wend.* 271,) it was held that the principal could not be charged as drawer of a bill by his agent, *the name of the principal not appearing on it,* but that the plaintiff was entitled to recover against the principal under a count for the consideration of the bill, the jury being warranted in saying that the goods were not sold on the exclusive credit of the agent. But that case differs from this; for in this the corporation could only act by an agent or some of its officers. Mr. Chitty, while he assumes the general rule to be, that no person can be considered as a party to a bill, unless his name appears on some part of it, admits that a person may become drawer, indorser, or acceptor, not only by his own immediate act, but also by that of his agent or partner. (*Chit. on Bills, Barb.* ed. 31.) He admits that corporations must act by their agents, and that when an instrument is so signed, the party receiving it must satisfy himself of the agent's authority. (*Id.* 32.)

But it is not material to decide the question whether the name of the principal must in every case be upon the bill, in order to charge him with the payment of the instrument. The evidence in this case supported the averment in the bill, that the drawing of bills by the agent at Port Henry, and the acceptance thereof by Horace Gray & Co. was merely a convenient mode adopted by the Port Henry Iron Company to raise funds, and thus became the adopted name of the company. If such evidence be admissible, and we think it is, then the company were bound for the payment of the drafts so drawn, although the corporate name of the company was not mentioned. Such evidence was held admissible by the supreme judicial court of Massachusetts, in

Milledge v. The Boston Iron Company, recently decided and reported in the Boston Courier for December 7, 1850, a case in many respects similar to the present. In that case it was held competent to show that a promissory note signed by Horace Gray & Co. was in fact the note of the Boston Iron Company, a corporation of which Horace Gray was the principal stockholder. It has already been seen that Horace Gray was the owner of about six-sevenths of the stock of the Port Henry Iron Company at the time the debts in question were contracted, and that he controlled all its operations from the beginning, and was its president.

With respect to persons who had not dealt with the company before giving the lease, *constructive* notice of the change was required. Constructive notice, says Judge Story, is in its nature no more than evidence of notice, the presumption of which is so violent, that the court will not allow even of its being controverted. (1 *Story's Eq.* § 399.) It is a question of fact whether such notice was given or not. The various dealings and transactions with the company at Port Henry, the continuance of the same sign on the store, the form of the bills against the company not objected to, of notes and receipts given, of notices posted in the name of the company, contracts made in the company name, by the president and other officers, and other acts and declarations of the officers, indicated a continuance of the business on the responsibility of the company. Third persons had a right to act upon those appearances. A different rule would put it in the power of the corporators who owned the majority of the stock, and controlled the operations of the corporation, to withdraw the corporate property from the reach of those who had trusted to its security, and transfer it to another class of creditors. No prudent man would have suspected that the expensive additions and improvements, constructed mainly in 1847, and amounting with the Stone purchase to near eighty thousand dollars, were the ordinary repairs of a tenant whose lease was about to expire.

Being of the opinion, from all the facts disclosed, that the Port Henry Iron Company, in its corporate capacity, is the real

principal, it is unnecessary to discuss the question in the other aspects which were so fully and ably presented on the argument. The law in this case coincides with the strong and controlling equities, by which the plaintiffs' claims are supported, and with sound morality. The labor, materials and funds of the plaintiffs are represented by the property now owned by the iron company at Port Henry. The plaintiffs afforded the means by which the latter was enabled to make great gains for its stockholders, and to survive the calamity which befel the other iron companies belonging to Mr. Gray. It is fit that the creditors, by whose advances of money and labor the works have been thus sustained and enlarged, and who have trusted to the responsibility of the corporation, in whole or in part, should be reimbursed, in preference to the creditors at large of Horace Gray or Horace Gray & Co., as an individual or commercial firm.

II. Assuming, then, that the plaintiffs have a meritorious cause of action, it remains to consider whether the objections which have been interposed are sufficient to defeat the present action. These objections are, 1st, that the bill is multifarious, and 2d, that it contains no ground for equitable relief. There are some minor objections which will be noticed in the same connection.

1st. As to multifariousness: The objection that the bill is multifarious can, in general, only be taken by demurrer. If, however, combination is charged, that must be denied by the answer; and if any thing more is answered, it overrules the demurrer. (2 *Wend.* 234. *Powell* v. *Arden*, 1 *Vernon*, 416.) The defendants have not demurred to the bill, but have answered; and have not in their answer insisted on multifariousness. The objection is raised on the hearing, after all the expense of taking the proofs has been incurred. It comes too late, therefore, to be listened to with favor.

The court itself may, indeed, raise the objection in any stage of the cause. It is matter of procedure only; and the court, though the objection be waived by answering over, will take the objection, if it becomes necessary to do so, for the purposes of

justice. (1 *Mylne & Keene*, 546. 1 *Coop. Pl. in Eq.* 182 *et seq.* *Oliver* v. *Platt*, 3 *How. S. C. U. S. Rep.* 333.)

Again; the parties in this case .have a common interest in the relief sought. And there is no apparent reason why the court should, of its own accord, withhold that relief, by interposing an objection which the defendants have waived.

The narrow rules which prevailed at law, with respect to parties to an action, and the consequences resulting from a misjoinder or nonjoinder, gave, in numerous instances, great advantages to prosecutions in equity, over those at law, and furnished the apology for many of the provisions of the code of procedure. (*Code*, §§ 111, 122, 124, *and see note of the Comm. on Pr. & Pl. to tit.* 3 *of the code.*)

There are two sorts of creditors' bills known to our jurisprudence; the one is the statutory bill, framed under 2 R. S. 173, in aid of a judgment creditor who has exhausted his remedy at law, to enable him to discover the debtor's property, and to reach his equitable interests. This bill was known before the statute. (*Hadden* v. *Spader*, 20 *John.* 554.) And the statute was framed to aid in carrying out the principle of that and other like decisions. In proceedings under such bill, it had always been held that several creditors by judgment of the same debtor might unite in the action, though they had no other common interest than in the relief sought. (*Edmeston* v. *Lyde*, 1 *Paige*, 367. *Wakeman* v. *Grover*, 4 *Id.* 23.) All the judgment creditors were *proper* parties, though not *necessary* parties, because the action could be sustained by a single judgment creditor. The same rule existed before the statute, and was applied in a creditor's suit by Chancellor Kent, in *McDermott and others* v. *Strong*, (4 *John. Ch. R.* 687.)

The other class of creditors' suits, not depending upon any statute, are suits brought for the administration of assets, to reach property fraudulently disposed of, or held in trust, &c. The bill in such case is filed in behalf of the plaintiff or plaintiffs, and all others standing in a similar relation, who may come in under such bill and the decree to be made. It may be filed by simple contract creditors, and does not require a judgment to

have been obtained. (*Barb. Ch. Pr. vol. 2, p.* 149.) It was well observed by Chancellor Kent in *Brown* v. *Rickets*, (3 *John. Ch. R.* 555,) that the question of parties is frequently perplexing and difficult to be reduced to rule; but it is stated in the books that creditors and legatees form exceptions to the general rule, that all persons interested in the fund must be parties. One creditor or one legatee may sue on behalf of himself and the rest, and the others may come in under the decree.

In *Good* v. *Blewitt*, (13 *Ves.* 397,) the bill was filed by the captain of a privateer, against the owners, for an account, according to the articles which had been executed, for a distribution of the prizes made by the ship. An objection was taken by the defendant for want of parties, and the complainant was allowed to amend by introducing a statement that the bill was on behalf of the plaintiff, and all others the mariners and persons who had signed the articles, and had not received their share of the prizes. In the course of the argument it was conceded that the case of legatees and creditors was not the only exception to the rule which requires all to be made parties who have an interest. This case shows that had a single creditor filed this bill, without stating that it was in behalf of others similarly situated, the cause must have stood over for want of parties. It proves also that a common interest in the fund affords a good ground to join parties. (*See also Fish* v. *Howland*, 1 *Paige*, 20.) Upon the same principles, a few members of a voluntary society, or unincorporated body of proprietors, have been permitted to sue in behalf of the whole, for an account, against their own agents and committee. In these and the like cases the bill must be specifically filed by the complainants in behalf of themselves and the rest having like interest.

In the cases enumerated, and such as are analogous, equity is satisfied with having so many parties before it as may be supposed to represent the claim fairly, to contest it honestly in behalf of the whole, and therefore in a sense to bind it; because of the manifest inconvenience, if not impossibility, of including all interested in the same right. Of course the principle always presupposes that the decree can be fitly made between the

parties before the court, without substantial injury to third persons. (*Fonb. Eq.* 222, *note.* *West* v. *Randall,* 2 *Mass. R.* 181.) The whole doctrine on the subject of parties, in cases like the present, is so fully stated by Judge Story in *West* v. *Randall,* (*supra,*) that it would be a waste of time to go over the subject in detail. The substance of his opinion is subjoined by the reporter as a note to *Wormly* v. *Wormly,* (8 *Wheaton,* 451, *et seq.*)

In *Innes* v. *Lansing,* (7 *Paige,* 584) the chancellor held that a creditor at large of an insolvent limited copartnership might file a bill in behalf of himself and all other creditors of the firm, standing in the same relation, to restrain the partners from disposing of the property, and for a receiver, and for a distribution of the property among all the creditors, ratably, according to the statute. He put it upon the ground that the title of the revised statutes relative to limited partnerships (1 *R. S.* 764) constituted the effects of the firm, a special fund for the benefit of all the creditors. The revised statutes treat the funds of a corporation, whether insolvent or not, which has surrendered its rights, privileges and franchises, by suspending for one year its lawful and ordinary business, as a trust fund for the payment of its debts, and constitute its directors the trustees thereof, and give the court of chancery jurisdiction. (*Compare* 2 *R. S.* 462, §§ 33, 38. *Ib. p.* 466, § 56. 1 *R. S.* 599 *to* 605.) So in *Taylor* v. *Jones,* (2 *Atk.* 600,) a bill was filed by simple contract creditors to be paid their debts out of £1733 stock vested in trustees for the benefit of the defendant for life, of his wife for life, and then for his children. The court held the conveyance in trust void, and decreed that the stock should be sold, and the debts paid out of the proceeds. Fraud and a trust gave the court jurisdiction, which was thus appropriately exercised in favor of creditors at large. The only common interest which the creditors had in that case, was an interest in the fund, and its proper application.

Thus it appears that according to the well settled principles of equity pleadings and practice, the objection of multifarious-

Conro *v.* Port Henry Iron Company.

ness, including both the non-joinder and mis-joinder of parties, can not be sustained.

Again, it is objected that the testimony of George W. Goff, Hiram Newell, William R. Warren and Albert Conro, ought to be stricken out. Wárren and Conro are parties, but by § 397 of the code of 1849, which is made applicable to existing suits, by the supplemental act, (§ 2, *sub.* 4,) they are permitted to be examined on the part of their co-plaintiffs. Goff was a stockholder of the Vergennes Bank, but he assigned his stock before his examination. But independently of this, a corporator is a *competent* witness under the code, in an action where the corporation is a party. (*The Washington Bank* v. *Palmer*, 2 *Sand. S. C. Rep.* 686. *The N. Y. & Erie Railroad Co.* v. *Cooke, Id.* 732.) The same principle was decided by this court, in *The Montgomery Co. Bank* v. *Marsh*, (*a.*) A corporator is neither a party to the action, nor the person for whose immediate benefit the suit is brought, within the meaning of the code. He stands, indeed, in the position of an interested witness, but is made competent by § 398 of the code. The objection to Newell goes only to his credit, and not to his competency. He is not a party to the suit, but merely a creditor, who may perhaps be entitled to prove his demand under the decree, if one be made in favor of the plaintiffs. He is a competent witness under the code.

In the progress of the hearing before the referee, there were some improper questions put on the part of the plaintiffs, which were objected to by the defendants' counsel, and answered by the witnesses. In all such cases, it has been the intention of this court to disregard such answers, and to base the decision on unexceptionable testimony.

2d. As to want of equity in the bill. It is possible that each of the plaintiffs has a good cause of action against one or more of the defendants, and yet they can not jointly maintain an action in a court of equity, against all. There must be some fact appearing on the face of the bill, which either shows that the par-

(*a*) See 11 *Barb.* 645.

ties have no remedy at law; or if there be a remedy at law, there must be some fact apparent which shows that the aid of a court of equity is necessary to render the remedy certain, adequate and effective. If the remedy at law be doubtful or obscure; if it can not reach the whole mischief, and secure the whole right; if it requires a multiplicity of suits, and the like, a court of equity in general has jurisdiction. (*Story's Eq.* § 33.) Fraud and trusts are subjects with which courts of equity are most frequently called to deal. In cases of fraud, a court of law in most cases, has a concurrent jurisdiction, but this does not supersede the necessity of a resort to the equity powers of the court. And if once the jurisdiction has rightfully attached, it is made effectual for the purposes of complete relief. When a court of chancery has once gained possession of the cause, if it can determine the whole matter, says Lord Nothingham, in *Parker* v. *Doe*, (2 *Ch. Cas.* 200, 201,) it will not be the handmaid of other courts; "nor beget a suit to be ended elsewhere." This was the settled doctrine of the court of chancery in this state under the former constitution. When the court had gained jurisdiction of a cause for one purpose, it retained it generally for relief. (*Armstrong* v. *Gilchrist*, 2 *John. Cas.* 431, *per Kent, J. Rathbone* v. *Warren*, 10 *John.* 587. *King* v. *Baldwin*, 17 *Id.* 384. *Story's Eq.* §§ 59, 71.)

In the present case, there were many circumstances which rendered the aid of a court of equity necessary, and which thus obviate the objection of a want of equity in the bill. Some of these circumstances have already been anticipated under the foregoing heads, but there are others still more important. (1.) The lease of the 30th April, 1845, of all the estate and property of the Port Henry Iron Company to Horace Gray, for two years and a half, was void. It was not made in pursuance of any act of the *directors* of the company, but was authorized to be executed at a meeting of the *stockholders*, held at the counting house of Horace Gray, on the 21st April, 1845. The charter of the company appointed the first directors, who were to hold their offices until others should be elected in their stead. (*Laws of* 1840, *p.* 208, § 4.) The corporation was vested with the general

Conro v. Port Henry Iron Company.

powers, and made subject to the prohibitions and restrictions of the general act. (1 R. S. 599, 605, tit. 3 and 4.) It is quite obvious from the charter, that the company could do no act except through its directors. When the charter prescribes the mode of action, its injunctions must be rigidly pursued. When no specific mode of action has been prescribed, the common law mode of acting may be inferred; but every corporation created by statute, must act as the statute prescribes, and the common law can not control by implication, that which the legislature has expressly sanctioned. (Per Story, J. in Fleckner v. U. S. Bank, 8 Wheat. 358. Angel & Ames on Corporations, 207.) The stockholders in this case had no power to make a lease, or do any other administrative act in the management of the affairs of the corporation. If a lease could be made at all, it could be executed only in pursuance of the act of the directors, who are the body appointed by the charter for the management of its affairs. It is no answer that the individual stockholders, who were present at the meeting when the lease was ordered, were also directors. They did not meet or act as directors, but as stockholders. The mayor and common council of a municipal corporation can only act in the manner prescribed by law. When not acting in their official character and in the mode prescribed by law, their acts are no more binding than those of other private citizens. (See per Ld. Mansfield, Rex v. Head, 4 Burr. 2515, 2521.)

(2.) Suppose this objection be untenable, we think it is not competent for a corporation, without authority from the legislature, to do any act which will have the effect of suspending its ordinary and lawful business, for any period, and much less for above a year. The 38th section of the act "of proceedings against corporations in equity," (2 R. S. 463,) among other things, enacts that whenever a corporation shall have suspended for one year, the ordinary and lawful business of such corporation, it shall be deemed to have surrendered the rights, privileges and franchises granted by any act of incorporation, or acquired under the laws of this state, and shall be adjudged to be dissolved. If the lease in this case was obligatory upon the cor-

poration, it suspended for two years and six months its ordinary and lawful business, and made it a mere instrument in the hands of Mr. Gray. It was an act of self destruction which the law can not tolerate. By the same statute, (2 *R. S.* 463, § 33, *sub.* 7,) the chancellor was authorized to set aside all alienations of property made by the trustees or other officers of any corporation, contrary to the provisions of law, or for purposes foreign to the lawful business and objects of such corporation, in cases where the persons receiving such alienation, knew the purpose for which the same was made. That power is now vested in this court. It can not be pretended that Gray was ignorant that the corporation was transcending its powers when it made the lease in question.

When this case was before us on appeal from the order appointing a receiver, we held that the case made by the bill brought it within the equity of the provisions of the foregoing statute. (2 *R. S.* 463, 6, §§ 38, 56. 4 *How. Pr. Rep.* 166.) Horace Gray, as president of the Port Henry Iron Company, was a trustee for the creditors of the company. The profits made by him in carrying on the works, belong to the trust fund, which in this case is the whole property of the corporation. A trustee is not permitted to speculate out of the funds of the *cestui que trust.* He is not allowed to make any gain, profit or advantage from the use of the trust fund. (*Green* v. *Winter,* 1 *John. Ch. Rep.* 27. *S. P. Parkist* v. *Alexander, Id.* 394. *Shuflin* v. *Stewart, Id.* 620. *Brown* v. *Rickets,* 4 *Id.* 303.)

(3.) The assignment of the corporate property by Gray, in payment of his individual debts, was a breach of trust, and properly cognizable in equity. The assignees, by accepting of the assignment, participated in this breach of trust. The assignment to Tuckerman was void on its face, if the dictum of Bronson, J. in *Barney* v. *Griffin,* (2 *Cowen,* 365,) be law. The lease by the corporation to Horace Gray, and the assignment of the latter to Tuckerman, were obstructions in the way of the ordinary remedies by an action at law against the corporation, which rendered the case a fit one for the interposition of a court of

equity. Fraud and trusts are among the undisputed subjects of chancery jurisdiction.

The assignment by Gray to Hooper, Coffin and Bullard, on the 10th December, 1847, of his 590 shares in the capital stock of the Port Henry Iron Company, does not aid the defendants. If the assignment be valid, the assignees take it subject to the equities of the creditors of the corporation. The interest which they acquire under the assignment is whatever remains after all the claims against the corporation shall have been first satisfied. In short, they stand in no better plight than Horace Gray, if no assignment had been made.

It has been objected that the bill does not aver the insolvency of the corporation, nor of the assignees. To this it may be answered, that the insolvency of a corporation is not made, by the revised statutes, the exclusive ground for relief in equity. The suspension of its ordinary and lawful business for a year, gives jurisdiction to the court, and that fact is sufficiently alledged. The insolvency of the assignees is not material. They create a cloud upon the plaintiffs' remedy at law, as effectually, if they are gentlemen of substance and respectability, as if they were men of straw. Equity having rightfully obtained jurisdiction to remove these obstructions and to dissipate these clouds, may retain it for all the purposes of remedial justice.

If it is not averred in terms that the lease to Gray and the assignment to Tuckerman were void, the allegation upon that subject can, if necessary, be made more specific by an amendment. The 6th chapter of title 6 of part 2 of the code of procedure, §§ 169, 176, is made applicable to existing suits, by title 1, ch. 1, sec. 2, sub. 1, of the act to facilitate the determination of existing suits in the courts of this state. The provisions of the code are amply sufficient to admit of any amendment to the bill, that would cure the defect; or which is the same thing in substance, justify the court in disregarding the omission of averments which have not misled the defendants. The proof was received without objection, both of the lease and assignments, and of all the acts bearing upon the question of fraud and trust.

If, however, any formal amendments are deemed necessary, by either party, to render testimony that was received without objection, pertinent, provision may be made in the decree for the same.

The plaintiffs are entitled to a decree against the Port Henry Iron Company for their respective debts, and must surrender up, to be deposited with the clerk of this court for Essex county, the various bills of exchange and other evidences of debt, if any, after the same shall have been exhibited to the referee hereinafter named. The assignment of the Stone property by Horace Gray to Hooper, Coffin and Bullard, must be declared void, and that property declared to be a part of the property of the corporation. The assignment to Tuckerman must be declared void, and the property therein mentioned declared to belong to the said corporation. But Tuckerman must be protected by the decree, and credited with all payments and expenses properly chargeable, prior to the service of the injunction, and be liable only for the residue. The cause must be remitted back to the same referee, John M'Lean, Esq., unless the parties agree upon another to compute the various amounts due to the plaintiffs, and to examine and cause to be filed the said bills of exchange, as above. On the filing and confirmation of the report the plaintiffs will be entitled to execution or other proper process to carry this decree into effect.

The plaintiffs are also entitled to their costs. These costs in equity should be paid by Horace Gray, by whose acts, omissions or misfortunes, the present controversy has been occasioned. None of the assignees are shown to be guilty of any wrong except the technical wrong of accepting an assignment, which amounted to a breach of trust in the assignor. Neither of them should be charged with costs personally, unless the property reached by the decree should prove insufficient to pay the whole of the plaintiffs' debts and costs, and the debts and costs of others similarly situated, who became parties hereto; and then they should be liable only for such portion of the costs as are not paid by the fund in controversy. The order in which the

defendants should be answerable for the costs as among themselves, if the fund proves inadequate, has not been discussed, and is reserved until the coming in of the report of the referee.

[St. Lawrence General Term, September 1, 1851. *Willard, Paige* and *Cady*, Justices.]